# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

―――――

Argued March 18, 2005           Decided May 31, 2005

No. 04-1261

PALACE SPORTS & ENTERTAINMENT, INC.,
*D/B/A* ST. PETE TIMES FORUM,
*F/K/A* TAMPA BAY ICE PALACE,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

―――――

Consolidated with
04-1276

―――――

On Petition for Review and
Cross-Application for Enforcement of an
Order of the National Labor Relations Board

―――――

*Robert M. Vercruysse* argued the cause for petitioner. With him on the briefs was *Gary S. Fealk*.

*David A. Fleischer*, Senior Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*, Assistant General Counsel, *Aileen A. Armstrong*,

Deputy Associate General Counsel, and *Meredith L. Jason*, Attorney.

Before: GINSBURG, *Chief Judge*, and EDWARDS and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* EDWARDS.

EDWARDS, *Circuit Judge*: Palace Sports & Entertainment, Inc. ("Palace" or "the Company") petitions for review of an order of the National Labor Relations Board ("NLRB" or "Board"), and the Board cross-applies for enforcement. On charges filed by the International Alliance of Theatrical Stage Employees, AFL-CIO ("Union"), the Board held that, in the months following Palace's assumption of operations at the St. Pete Times Forum ("Forum") in Tampa, Florida, the Company committed various unfair labor practices in violation of § 8(a)(1) and (3) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(a)(1), (3) (2000). Specifically, the Board found that Palace prohibited employees from conversing about the Union, interrogated employees about their knowledge of union activity and their communications with the Board, and threatened employees if they cooperated with the Board or supported the Union, all in contravention of § 8(a)(1). The Board also concluded that the Company violated § 8(a)(1) and (3) by disciplining and subsequently discharging a pro-union employee, Peter Mullins. The Board issued an order requiring the Company to cease and desist from its unlawful conduct and to take certain affirmative remedial action, including the reinstatement of Mullins with back pay. *See St. Pete Times Forum*, 342 N.L.R.B. No. 53, 2004 WL 1701333 (July 27, 2004). The Company does not challenge most of the Board's § 8(a)(1) findings; accordingly, we grant the cross-application to enforce the portions of the Board's order based on these unchallenged findings of unfair labor practices.

Palace's principal claim in this case is that the Board erred in concluding that the employer's discipline and later discharge of Mullins violated the Act. Mullins was issued warnings for violating the Company's solicitation and harassment policies during the course of his discussions with a fellow employee about whether to join the Union. In evaluating this disciplinary action, the Board relied on the framework approved in *NLRB v. Burnup & Sims, Inc.*, 379 U.S. 21, 23 (1964), under which an employer violates the Act, despite its good faith, by disciplining an employee for misconduct arising out of a protected activity, when it is shown that the misconduct did not in fact occur. The Board concluded that Mullins did not in fact commit the offenses for which he was disciplined. We conclude that these findings are supported by substantial evidence.

Months after he received the disciplinary warnings, Mullins was discharged for making an improper remark during a conversation with an employee of a vendor located in the Forum. The Board ostensibly employed the framework set forth in *Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981), to determine whether protected activity was the motivating factor in Palace's decision to fire Mullins. The Board's opinion on this point is hopelessly unclear, so we are unable to discern the precise basis upon which the Board concluded that Mullins' discharge was unlawful. We therefore remand the case to the Board so that it may revisit this issue.

## I. BACKGROUND

### A. *Factual Background*

Palace Sports & Entertainment, Inc. owns and operates various sports and entertainment arenas, including the Palace of Auburn Hills located near the Company's headquarters in Detroit, Michigan. In July 1999, the Company purchased the Ice Palace in Tampa, Florida, an arena which has since become known as the St. Pete Times Forum. Palace assumed various

contractual obligations made by the previous owner, including a contract with SMG, a company whose employees maintained the facility and performed the work necessary to effectuate conversions of the arena floor, *e.g.*, from a hockey rink to a concert venue.  SMG had a labor contract with the Union.

When Palace purchased the Forum, it decided that it would take control over the maintenance and conversion operations itself instead of employing subcontractors like SMG.  On June 30, 2001, when SMG's contracts with the Forum and the Union expired, Palace assumed the maintenance and conversion operations for the arena.  The Company hired some of SMG's former employees, including numerous Union officials, but it did not recognize the Union.  One of the employees Palace hired was Peter Mullins, a mechanical engineer who had been on the Union's negotiating committee while he was employed by SMG.   After he was hired, Mullins and other pro-union employees began soliciting union authorization cards.   The presence of this union activity at the Forum resulted in a number of incidents involving the management of the Company, which ultimately resulted in the filing of unfair labor practice charges in this case.

On June 27, 2001, the Company posted a policy prohibiting solicitation by one employee to another "while either is working."   In response to some complaints from employees regarding solicitation on behalf of the Union, Palace vice president Sean Henry reviewed this no-solicitation policy with employees at a meeting on July 18.  He informed the employees that solicitation in violation of the Company's policy could result in termination.  During the course of the meeting, Henry effectively promulgated a rule prohibiting any conversation about the Union.  Specifically, Henry told employees that they could "talk about virtually anything" so long as they did not solicit.    But by "virtually anything" Henry excluded

conversations about the Union, because he viewed any discussion regarding the Union as solicitation.

In mid-July, operations manager Carson Williams asked employee Thomas Roberts whether anyone had approached him "about the union organization process." After Roberts responded that nobody had, Williams said, "I know if anyone comes to you, you will let me know." Also in mid-July, employee George Freire spoke with a new employee and gave him a union authorization card. The next day, Williams told Freire "not to be discussing union issues on the clock or in the building."

Around November 20, 2001, Williams approached Roberts and told him that he "didn't like rumors" and wanted to clear one up. He said that he had heard that Roberts had gone to the NLRB to complain about him, and asked Roberts to explain his action. Roberts answered that he did not know what Williams was talking about, that he had not gone to the Board. Williams then conceded that it might have been another employee with the same name as Roberts who had complained to the Board, but that "it would all come out and once it did" Williams "would take care of it."

On June 18, 2002, Williams called Mullins to his office to fix a problem with the building's automation system. After the problem was corrected, Williams commented that he would be "lost" without Mullins, to which Mullins replied that he was not planning on going anywhere. Williams then told Mullins that if he "and the rest of the union supporters file for a new election, then you are going to be terminated." When Mullins responded that he could not be fired for "doing something legal," Williams stated that the Company would terminate the leader "and then the rest of you will get in line." Mullins asked Williams who had told him that, and Williams replied, "Sean Henry."

On July 11, 2002, less than a month after this conversation, employee James Carpenter arranged to speak with Henry to complain about Peter Mullins. According to Henry, Carpenter reported that Mullins would not leave him alone, that he "is always . . . talking to me and telling me the merits of the Union." Carpenter told Henry that initially this happened "three, four, five times a week," but that it was now "every time" he saw Mullins. Carpenter further noted that he had told Mullins to leave him alone "dozens of times."

Henry referred the matter to the Company's human resources director, Beth Fields, and, the next day, Henry, Fields, and Williams met with Carpenter. According to a memorandum summarizing this meeting (signed by Henry, Williams, Carpenter, and Carpenter's supervisor), Carpenter reported being "harassed and solicited" by Mullins. He specifically reported the most recent incident, which had taken place in the employee break room at 7:30 a.m. on July 11, before Carpenter had clocked in but after Mullins began work at 7:00 a.m. Carpenter related that he and another employee went to the break room, where Mullins asked him why he would not join the Union. Carpenter explained that he liked working for Palace and that the Company had been good to him. Mullins told Carpenter that the Union could negotiate a better raise for him, but Carpenter responded that he was not interested and then left. Carpenter reported that Mullins was always "'antagonizing'" him about joining the Union and confronts him "at least 3-5 times per week," and that it was interfering with his work.

Following this meeting, Carpenter prepared a written statement, dated July 17, 2002, in which he stated that, "[f]or the past couple of weeks," he had been "stopped in the hallways" and "inside the breakroom" by Mullins "about hav[ing] the union back into this building," and that he was "getting t[ir]ed" of it. Carpenter's statement recounted the July 11 break room

incident, adding that he told Mullins before walking away, "I don't want to hear about it any more."

There is no evidence that Carpenter again complained about Mullins after July 11. On July 18, Fields, Henry, and Williams interviewed Mullins regarding Carpenter's complaints. Henry testified that, at that meeting, Mullins stated that he had no idea what Carpenter was talking about. Mullins asserted that Carpenter was already a member of the Union and that he talked to Carpenter about the Union only to answer Carpenter's questions. Henry also recalls that when he confronted Mullins with Carpenter's claim that he asked Mullins to stop "countless times," Mullins replied, "I don't recall him ever asking me to stop."

In his own testimony, Mullins claimed that he never initiated any conversations about the Union with Carpenter, but rather that Carpenter would bring up the subject and was "confused," "afraid that . . . he was going to lose his job if he supported the Union." Mullins maintained that he never intimidated or harassed Carpenter during these conversations. Regarding the specific incident on July 11, Mullins recalled that Carpenter "brought up the subject about how his father-in-law had told him that he didn't need a union." Mullins responded, "Well, James, you know, in a perfect world you don't need a union . . . [but we are] already making a lot less money since Palace . . . eliminated the contract and, you know, we're not getting overtime after eight."

For his part, Carpenter testified that Mullins had spoken to him about bringing the Union back, and that he replied that he wanted to give the Company a chance. Mullins replied, "Okay." A couple of weeks later, Mullins spoke with him again, and he replied, "No. I don't want it yet." Carpenter testified that Mullins continued to approach him "on several occasions." He explained that when he was in the break room before clocking in and "when I'm going from one job to another job . . . he

approaches me and stops and asks me about the Union." On those occasions, Carpenter told Mullins, "I don't want to discuss it right at this moment." Carpenter denied initiating the conversations as Mullins has claimed.

On July 25, 2002, Mullins was issued two disciplinary warnings. The first was a written warning for violating the Company's solicitation policy on July 11, 2002. The warning states that, while on work time, Mullins "asked an employee why he would not join a labor union." The second warning, a final written warning, was for violation of the Company's policy against harassment. It explains that "[d]uring the months of June and July 2002," Mullins harassed an employee "in various work areas at least 3 to 5 times a week even after the employee being harassed asked [Mullins] to stop. The employee states that [Mullins] has stopped him in his work area and in his words, 'intimidated' him about joining a labor union while he was on work time. The employee repeatedly asked [Mullins] to stop talking to him about joining a labor union, but [Mullins] continued."

On October 2, 2002, Carpenter signed a union authorization card. Mullins testified that Carpenter requested the card. Carpenter admitted signing the card, but denied requesting it. There is no evidence that Carpenter made any complaint on this occasion. About three weeks later, the Union filed a petition for a representation election.

On October 23, Mullins initiated a conversation with Alice Castillo, an employee of a vendor located in the Forum. The two were discussing a newspaper article regarding wages in Florida when the conversation turned to whether wages in Florida were lower than those paid in northern states. According to Castillo, she asked Mullins what wages were in other southern states like Alabama and Mississippi, in response to which Mullins loudly called her a "Yankee bitch." Mullins denies making the remark. Castillo prepared a statement for her

supervisor recounting the incident, and the statement was ultimately forwarded to Palace officials.

Upon learning of the incident, Fields spoke with Castillo, who repeated her allegation regarding the incident and stated that "it had been going on for a long time and that she had just had enough." Mullins heard from a fellow employee that Castillo was upset with him over something, and went to her to apologize for anything he may have said that offended her.

On October 31, Henry, Fields, and Williams met with Mullins. Mullins stated that he did not recall calling Castillo a "Yankee bitch"; he also explained that he had apologized to her for anything he may have said. Fields testified that she believed Castillo, because Mullins had only stated that he "did not recall" making the offensive statement. On November 3, Mullins was discharged. Fields testified that the Company fired Mullins because he "made inappropriate comments and his conduct was inappropriate."

## B. *The Board's Decision*

On the basis of the above evidence, a NLRB Administrative Law Judge ("ALJ") concluded that Palace violated § 8(a)(1) by: (1) prohibiting conversations about the Union while permitting conversations relating to other matters; (2) interrogating employees about their knowledge of employee interest in the Union and directing them to report the union activities of their coworkers; (3) interrogating employees about their communications with the NLRB and threatening reprisals if employees cooperated with the Board; and (4) threatening employees with discharge because of their support for the Union.

Considering next the disciplinary warnings issued to Mullins, the ALJ credited Mullins' version of the events on July 11 and, accordingly, found that he did not solicit Carpenter. The ALJ alternatively found that, even if Mullins did solicit

Carpenter, Mullins did not violate the Company's solicitation policy, because Mullins talked with Carpenter while engaged in nonwork activity. With respect to the harassment warning, the ALJ credited Mullins' assertion that he never approached Carpenter and found that, even if he had, the encounters to which Carpenter testified did not constitute harassment. Finding that Mullins was disciplined while engaging in protected activity for misconduct he did not commit, the ALJ concluded that Palace violated § 8(a)(1) under the *Burnup & Sims* framework. Without any further explanation, the ALJ found that Mullins was warned for engaging in union activity, and thus concluded that the warning also violated § 8(a)(3).

Turning to Mullins' conversation with Castillo, the ALJ credited Mullins' testimony that he did not make any offensive statement, finding that Castillo either misheard or misunderstood his remark. The ALJ noted, however, that because Mullins was not engaged in protected activity when he committed the alleged misconduct, the *Burnup & Sims* framework was inapplicable and, accordingly, the Company was entitled to rely on its good-faith belief in Castillo's version of the incident.

Applying the *Wright Line* test for determining the relationship, if any, between employer action and protected employee conduct, the ALJ concluded that the General Counsel had carried his burden of showing that Mullins' union activity was a substantial and motivating factor in Palace's decision to discharge Mullins. The ALJ next considered whether the Company had carried its burden of showing that it would have taken the same disciplinary action even in the absence of Mullins' protected activity. Evaluating the Company's written policies regarding "indecent conduct or language," as well as the only other documented incident in the record regarding such behavior, the ALJ found that Palace had not satisfied its burden.

The ALJ accordingly concluded that Mullins' discharge violated § 8(a)(3).

After considering exceptions filed to the ALJ's decision, the Board affirmed the ALJ's findings and conclusions. The Board, however, specifically addressed Mullins' discharge. The Board ostensibly applied the *Wright Line* framework, agreeing first with the ALJ that the General Counsel "made the required initial showing that Mullins' union activity was a substantial or motivating factor in his discharge." Proceeding to the question of whether Palace had established that it would have discharged Mullins even in the absence of his protected activity, the Board noted that the Company had argued that "Mullins' angry outburst at Castillo created sufficient concern for Title VII liability that it discharged him." The Board then concluded that Palace had "failed to show that it would have discharged Mullins even in the absence of his union activity in order to avoid the imposition of Title VII liability." *See generally* Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*. (2000).

In reaching this judgment, the Board suggested that it would have been "unreasonable" for Palace to discharge Mullins in order to avoid Title VII liability. The Board reasoned as follows:

> The Supreme Court has held that a single, isolated comment generally is not sufficient to justify the imposition of Title VII liability. *Clark*[] *County Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001). Moreover, even where an employee has been shown to have sexually harassed a co-worker, Title VII does not necessarily require the employee's discharge, so long as the employer takes reasonable action to protect the complainant from further harassment. *Baskerville v. Culligan International Co.*, 50 F.3d 428, 432 (7th Cir. 1995).

12

Based on this understanding of Title VII law, the Board concluded:

> We recognize that employers have a legitimate interest in preventing workplace sexual harassment and a correlative obligation to respond when such incidents occur. In this case, however, we find that the [Company] has not established that it had reasonable grounds for determining that it had to remove or discipline Mullins in order to avoid liability under Title VII.

On this basis, the Board found that Palace's "asserted Title VII concerns" were pretextual.

In light of these conclusions, the Board ordered Palace to cease and desist from engaging in the unlawful conduct it was found to have committed or, in any like manner, interfering with, restraining, or coercing employees in the exercise of their rights under the Act. The Board also ordered Palace to offer Mullins full reinstatement to his former job or a substantially equivalent position, make him whole for any loss of earnings or other benefits, and expunge any records of his disciplinary warnings and discharge.

## II. ANALYSIS

### A. *The Unchallenged Findings of § 8(a)(1) Violations*

Palace does not challenge the Board's conclusions that it engaged in unfair labor practices in violation of § 8(a)(1) in prohibiting employee conversations about the Union while permitting conversations relating to other matters, interrogating employees about their knowledge of employee activity in support of the Union and directing them to report the union activities of their coworkers, interrogating employees about their communications with the NLRB and threatening reprisals if employees cooperated with the Board, and threatening employees with discharge because of their support for the

Union. Accordingly, we grant the Board's application to enforce the portions of its order that correspond to these findings. *Titanium Metals Corp. v. NLRB*, 392 F.3d 439, 445 (D.C. Cir. 2004).

**B.** *The Board's Conclusion That the Warnings Were Unlawful*

Palace challenges the Board's conclusion that it committed unfair labor practices in violation of § 8(a)(1) and (3) by issuing the disciplinary warnings to Mullins on July 25, 2002. Because we conclude that the Board's § 8(a)(1) finding is supported by substantial evidence, and because Palace offers no persuasive reason to believe that the additional finding under § 8(a)(3) had any material effect on the order, we have no occasion to address the latter finding. *See Burnup & Sims*, 379 U.S. at 22 ("We find it unnecessary to reach the questions raised under § 8(a)(3) for we are of the view that in the context of this record § 8(a)(1) was plainly violated . . . ."); *see also Wal-Mart Stores, Inc.*, 341 N.L.R.B. No. 111, 2004 WL 963353, at *1 n.2 (Apr. 30, 2004) ("[W]e agree with the judge that [the] discharge violated Sec. 8(a)(1) of the Act. We therefore find it unnecessary to pass on the judge's finding that the discharge violated Sec. 8(a)(3), because this additional finding would be essentially cumulative with no material effect on the remedy."), *enforced*, No. 04-1219, U.S. App. LEXIS 6731 (D.C. Cir. Apr. 19, 2005) (per curiam).

Section 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of" their rights to organize, bargain collectively, and engage in concerted activities. 29 U.S.C. § 158(a)(1). Under the framework approved by the Supreme Court in *Burnup & Sims*, an employer violates § 8(a)(1) by disciplining an employee "if it is shown that the [disciplined] employee was at the time engaged in a protected activity, that the employer knew it was such, that the basis of the [discipline] was an alleged act of misconduct in the course of that activity, and that the

employee was not, in fact, guilty of that misconduct." 379 U.S. at 23. In such circumstances, the employer's good-faith belief that the misconduct occurred is no defense, for "[a] protected activity acquires a precarious status if innocent employees can be discharged while engaging in it, even though the employer acts in good faith." *Id.* In this case, the Board found that the warnings violated § 8(a)(1) because Mullins did not in fact engage in the misconduct for which he was disciplined.

The Board's findings of fact are "conclusive" if "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e)-(f) (2000). Because "[s]ubstantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," we will reverse for lack of substantial evidence "only when the record is so compelling that no reasonable factfinder could fail to find to the contrary." *Resort Nursing Home v. NLRB*, 389 F.3d 1262, 1270 (D.C. Cir. 2004) (internal quotation marks omitted). In making this inquiry, we will not disturb the Board's adoption of an ALJ's credibility determinations "unless those determinations are 'hopelessly incredible,' 'self-contradictory,' or 'patently unsupportable.'" *United Servs. Auto. Ass'n v. NLRB*, 387 F.3d 908, 913 (D.C. Cir. 2004) (internal quotation marks omitted). Applying these standards, it is clear that substantial evidence supports the Board's findings that Mullins did not engage in the misconduct for which he was warned.

The Board, adopting the ALJ's credibility determinations, credited Mullins' testimony regarding his encounters with Carpenter in general, and their July 11 conversation in particular. Accordingly, the Board found that, on July 11, Mullins did not ask Carpenter "why he would not join a labor union." Rather, the Board accepted Mullins' account that Carpenter approached Mullins, mentioning that his father-in-law had told him that employees did not need a union, and that Mullins merely responded by giving reasons why the employees

did need a union, referring to reductions in wages and benefits since the Company became their employer. The Board also accepted Mullins' claim that he never approached Carpenter to talk about the Union, but only discussed the subject when Carpenter brought it up.

In crediting Mullins, the Board observed that there was "no evidence contradicting" Mullins' assertion that Carpenter was already a union member, and also noted that Carpenter, though called as a witness by the Company, did not testify about the July 11 conversation, and thus failed to contradict Mullins' account of it. *St. Pete Times Forum*, 2004 WL 1701333, at *16. The Board further cited numerous inconsistencies in Carpenter's statements, *id.* at *17-*18, and concluded that the fact that Carpenter eventually signed a union authorization card in October 2002 "casts serious doubt upon [Carpenter's] assertion that he informed Mullins that he was not interested in the Union and supports Mullins' testimony that Carpenter was 'confused,'" *id.* at *16.

Palace argues that the Board erred in crediting Mullins over Carpenter. In particular, Palace argues that: (1) any inconsistencies in Carpenter's statements are at best minor and based on an overly literal reading of those statements; (2) Mullins' statement that Carpenter was already a union member at the time of alleged solicitations (June and July of 2002) is in tension with the undisputed facts that Carpenter complained to management about being solicited and that Carpenter signed an authorization card in October 2002; and (3) because Carpenter was undeniably a member of the Union at the time of his testimony before the Board, he had no motivation to testify falsely. *See* Br. of Pet'r at 14-15, 17-19. Although these are plausible arguments for crediting Carpenter over Mullins, they surely do not demonstrate that the Board's contrary determinations crediting Mullins are "hopelessly incredible," "self-contradictory," or "patently unsupportable," as our cases

require. In short, we have no basis to overturn the Board's credibility determinations.

Moreover, the Board alternatively found that *even if* it were not to credit Mullins' testimony, Mullins' conduct nevertheless would not have constituted violations of Palace's solicitation and harassment policies. Regarding the warning for soliciting Carpenter on July 11, the Board concluded that even if Mullins had solicited Carpenter during their conversation, this would not have violated the solicitation policy because "he was engaged in a nonwork activity." *St. Pete Times Forum*, 2004 WL 1701333, at *16-*17.

The Company's solicitation policy prohibits solicitation by one employee to another only "while either is working." *Id.* at *9. The policy further explains:

> Working time is when an employee's duties require that he/she be engaged in work tasks. Working time does not include an employee's own time, such as meal periods, scheduled breaks, time before and after a shift and personal cleanup time. We believe that you should not be disturbed or disrupted in the performance of your job.

*Id*. It is undisputed that Carpenter was not on working time during his conversation with Mullins. Although Mullins began work at 7:00 a.m. and the incident occurred at 7:30 a.m., the Board found that Mullins' duties "did not require that he be engaged in work during the brief interval that he obtained coffee." *Id.* at *16. Palace argues that this finding was erroneous because it is undisputed that Mullins was not on a "scheduled break" at that time. Br. of Pet'r at 15-17. But, as the Board noted, operations manager Williams testified that employees like Mullins were permitted to "go into the break room and get coffee and keep on going." Tr. of NLRB Proceedings at 527, *reprinted in* J.A. 134, 287. Moreover, the Board noted that the disputed conversation consumed no more

than 15 seconds, well within the amount of time it would take to get a cup of coffee. *St. Pete Times Forum*, 2004 WL 1701333, at \*16. Accordingly, there is substantial evidence in the record to support the Board's conclusion that Mullins was engaged in nonwork activity during his conversation with Carpenter.

With respect to the second warning, for harassment of Carpenter during June and July of 2002, the Board found that, even if Mullins did initiate conversations with Carpenter to the extent alleged by Carpenter, Carpenter's testimony before the Board did not establish that he was "harassed," "intimidated," or approached after telling Mullins to stop the conduct cited by the warning. This alternative finding is also supported by substantial evidence.

As the Board noted, Carpenter made it clear that he did not fear that Mullins would hurt him. Tr. at 416, J.A. 237. Carpenter also testified that when Mullins approached him, Mullins never physically restrained him; Carpenter would simply tell Mullins that he did not want to discuss the matter and would walk away. *Id.* at 415-16, J.A. 236-37. Indeed, neither Carpenter nor any other witness cited any conduct by Mullins that could reasonably be thought to constitute "intimidation." Regarding the warning's only specific example of "harassment" – the continued solicitation of Carpenter after he asked Mullins to stop – the Board found that Carpenter made no such unequivocal request until July 11. Carpenter's July 17 written statement and the notes of the July 11 meeting between Carpenter and management refer only to one occasion after the July 11 conversation on which Carpenter told Mullins that he did not want to talk about the Union any further. *See* Summary of 07/11/02 Meeting, *reprinted in* J.A. 97; 07/17/02 Statement of Carpenter, *reprinted in* J.A. 98. In his testimony before the Board, Carpenter stated that he told Mullins, "I don't want [the Union] yet," "I don't want to discuss it now," and "I don't want to discuss it right at this moment." Tr. at 409-10, J.A. 230-31.

Carpenter never corroborated Henry's assertion that Carpenter reported telling Mullins to stop "dozens of times." Accordingly, the Board reasonably found that Carpenter did not tell Mullins until July 11 not to talk to him about the Union. Thus, in light of Mullins' undisputed testimony that, after July 11, he did not speak to Carpenter again until October 2002 (when Carpenter signed the authorization card), substantial evidence supports the Board's finding that the harassment asserted as the ground for the second warning never occurred.

Finally, there is no merit to Palace's suggestion that, because the Board concluded that Mullins did not solicit Carpenter, Mullins therefore could not have engaged in protected activity, a necessary element of a § 8(a)(1) violation under the *Burnup & Sims* framework. *See* Br. of Pet'r at 14 n.11. There is no question that "employees' right to discuss self-organization among themselves" is protected under the Act, *see NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 113 (1956), and remains so regardless of who approaches whom and whether the conversation constitutes "solicitation."

On this record, the Board reasonably concluded that Palace violated § 8(a)(1) of the Act by issuing the disciplinary warnings to Mullins.

## C. *The Board's Conclusion That the Discharge Was Unlawful*

Because Mullins' conversation with Castillo did not itself constitute protected activity, the *Burnup & Sims* framework for finding § 8(a)(1) violations is inapplicable. It is therefore irrelevant that the Board credited Mullins' testimony that he did not make any offensive remark to Castillo, *unless* the record otherwise indicates that the employer acted pursuant to anti-union animus in firing Mullins. In other words, the issue here is whether, by discharging Mullins, Palace "discriminat[ed] . . .

to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

In addressing the § 8(a)(3) charge, the Board treated this case as one involving a question of "dual motivation," *i.e.*, a case in which the employer defends against a § 8(a)(3) charge by arguing that, even if an invalid reason might have played some part in the employer's motivation, the employer would have taken the same action against the employee for a permissible reason. The Board analyzes such claims under the framework set forth in *Wright Line*, 251 N.L.R.B. at 1089. We have explained that framework as follows:

> Under the *Wright Line* test, the general counsel must first show that the protected activity was a motivating factor in the adverse employment decision. If this prima facie showing is made, the burden shifts to the employer to demonstrate that it would have made the adverse decision even had the employee not engaged in protected activity.

*Int'l Union of Operating Eng'rs, Local 470 v. NLRB*, 350 F.3d 105, 110-11 (D.C. Cir. 2003) (internal quotation marks and citations omitted).

The ALJ clearly applied this framework in evaluating Mullins' discharge. After finding that the General Counsel had made out a prima facie showing, the ALJ proceeded to evaluate whether Palace had established that it would have discharged Mullins even in the absence of his protected activity. *St. Pete Times Forum*, 2004 WL 1701333, at *22. The ALJ noted that, although Palace characterized Mullins' remark as "sexual harassment," "there is no evidence of any sexual advance by Mullins." *Id.* at *23. The ALJ then discussed the Company's written policies prohibiting "indecent conduct or language," noting that the policies include a progressive disciplinary system whereby "'[t]ermination is the *last step*'" in the disciplinary progression. *Id.* Finally, the ALJ found that, in the only other

comparable disciplinary incident in the record, another employee who used "vulgar and profane language towards customers" was only warned after his first offense. This employee was not fired until after a repeat offense. On this record, the ALJ held that the Company had not met its burden under *Wright Line*. *Id*.

The Board, at the outset of its decision, announced that it had "decided to affirm the judge's rulings, findings, and conclusions." *Id.* at *1 (footnoted omitted). The Board then went on to render its own opinion, employing a rationale to support the finding of a § 8(a)(3) violation that is entirely different from the rationale offered by the ALJ. It is therefore unclear whether the Board opinion is intended to supplement or displace the ALJ's rationale in sustaining the § 8(a)(3) charge. The Board agreed with the ALJ that the General Counsel had made out a prima facie case. *Id.* That conclusion was justified: the ALJ found that Mullins' supervisors had threatened to fire him if the Union filed for a new election, and Mullins was indeed fired shortly after the Union filed. The Board also agreed that Palace had failed to establish that it would have discharged Mullins even in the absence of his union activity. *Id*. at *2. However, in considering whether the Company had met its burden under *Wright Line*, the Board focused almost exclusively on Palace's claim that it would face potential liability under Title VII if it did not dismiss Mullins for his alleged offensive statement to Castillo.

In following this approach, the Board stated that the ALJ's decision rested on a finding that Palace "failed to show that it would have discharged Mullins even in the absence of his union activity *in order to avoid the imposition of Title VII liability.*" *Id*. (emphasis added). The Board's characterization of the ALJ's decision is perplexing, because, although the ALJ did conclude that there was "no evidence of any sexual advance by Mullins," the ALJ's holding that Palace had violated § 8(a)(3) rested on

findings that neither the Company's "progressive disciplinary system" nor the Company's handling of "other documented incident[s] regarding indecent conduct or language" could explain Palace's decision to fire Mullins. *Id.* at *23. The ALJ's analysis and concluding findings say nothing about Title VII. *Id.* at *22-*23. Indeed, there is *nothing* in the ALJ's opinion even to suggest that Palace argued that the employer fired Mullins in order to avoid the imposition of Title VII liability. And Palace does not contend here that this affirmative defense was specifically raised in the hearing before the ALJ.

Ignoring the ALJ's stated grounds for finding a § 8(a)(3) violation, the Board concluded that Palace had "not established that it had reasonable grounds for determining that it had to remove or discipline Mullins in order to avoid liability under Title VII." *Id.* at *2. The basis for this conclusion was the Board's view that Title VII liability would not arise from Mullins' single, isolated remark. *Id.* at *2 n.8.

The problem here is that, in focusing on Title VII, the Board misapplied *Wright Line.* The question under *Wright Line* is whether the Company has established in fact that it would have taken the same action in the absence of any anti-union animus. It is not whether the Company has established that its actions were "reasonable." *See Epilepsy Found. of Northeast Ohio v. NLRB*, 268 F.3d 1095, 1105 (D.C. Cir. 2001) ("[A]n employer may discharge an employee for a good reason, a bad reason, or no reason, so long as it is not for an unlawful reason."); *Meco Corp. v. NLRB*, 986 F.2d 1434, 1438 (D.C. Cir. 1993) (same). The Board's view that Palace was unreasonable in assuming that failure to sanction Mullins might result in Title VII liability does not, without more, indicate that Palace would not have fired Mullins in the absence of anti-union animus.

As noted above, the Board stated that it meant to affirm the ALJ's rulings, findings, and conclusions. But the Board's *Wright Line* analysis focuses solely on the Title VII issue and

never addresses the ALJ's evaluation of the Company's written policies and disciplinary practices. Therefore, we cannot be sure to what extent the Board meant to incorporate the ALJ's analysis in those respects while merely rejecting any implication in the ALJ's decision that sexual harassment arises only in connection with comments containing sexual advances.

In sum, we are unable to discern the precise basis upon which the Board rested in reaching its conclusion that Mullins' discharge violated the Act. The Board's decision can be read in at least three ways: (1) as concluding that the discharge was unlawful because it was unnecessary to avoid the potential for Title VII liability, and therefore substantively unreasonable; (2) as finding that, because Palace's Title VII concerns are so unreasonable, and thus implausible, they must be a pretext for discrimination; or (3) as adopting the ALJ's finding that, in light of Palace's written policies and disciplinary practices, the Company has not established that it would have discharged Mullins even in the absence of his protected activity. Or, the Board might have meant to say something else altogether. The point is, we cannot tell. Because it is axiomatic that we may review an agency's order only on the reasoning supplied by the agency in the order, *see Williams Gas Processing - Gulf Coast Co., L.P. v. FERC*, 373 F.3d 1335, 1345 (D.C. Cir. 2004) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943)), meaningful judicial review requires us to remand the case to the Board for clarification of its position on the § 8(a)(3) issue.

On remand, the Board should explain the precise reasoning on which it means to rest its conclusion that Mullins' discharge violated the Act. The Board should specifically state which portions of the ALJ's analysis it adopts and which parts it rejects. We also note that, although the ALJ appeared to evaluate Mullins' discharge solely under § 8(a)(3), using the *Wright Line* framework, *see St. Pete Times Forum*, 2004 WL 1701333, at *23, the Board, without explanation, stated that it

"agree[d] with the judge that [Palace] violated Section 8(a)(1) *and* (3) when it discharged employee Peter Mullins," *id.* at *1 (emphasis added). It is unclear whether the Board really meant to find that Palace violated § 8(a)(1) when it fired Mullins and, if so, on what grounds. The Board can address this issue on remand.

### III. CONCLUSION

For the foregoing reasons, we grant in part the Board's application for enforcement. We remand the case to the Board, however, for clarification of its conclusion that Palace violated the Act by discharging Mullins.

*So ordered.*