**EPILEPSY FOUNDATION OF NORTHEAST OHIO,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 00–1332.

• United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 2, 2001.

Decided Nov. 2, 2001.

Anita Barondes argued the cause for petitioner. With her on the briefs were Peter Chatilovicz, Ronald A. Lindsay, and Steven M. Moss.

Maurice Baskin, Stephen A. Bokat, Robin S. Conrad, Heather L. MacDougall, Daniel V. Yager, Harold P. Coxson Jr., Burton J. Fishman, Robert J. Verdisco, Jan S. Amundson, and Quentin Riegel were on the brief for amici curiae LPA, Inc., et al., in support of petitioner.

Meredith L. Jason, Supervisory Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were Arthur F. Rosenfeld, General Counsel, John H. Ferguson, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel. Frederick L. Cornnell, Jr., Attorney, entered an appearance.

James B. Coppess argued the cause for amicus curiae American Federation of Labor and Congress of Industrial Organizations, in support of respondent. With him on the brief were Jonathan P. Hiatt and Laurence Gold.

Before: EDWARDS, ROGERS, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

Petitioner, the Epilepsy Foundation of Northeast Ohio ("the Foundation"), challenges a National Labor Relations Board ("NLRB" or "Board") decision finding that the Foundation committed unfair labor practices when it discharged Ashraful Hasan and Arnis Borgs in violation of § 8(a)(1) of the National Labor Relations Act ("NLRA" or "Act"). In reaching this result, the NLRB first interpreted § 7 of the Act to extend the rule of *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975), to nonunion workplaces. The Board then applied the new rule retroactively in holding the Foundation liable for Borgs' discharge. *Epilepsy Found. of Northeast Ohio*, 331 N.L.R.B. No. 92, at 1, 2000 WL 967066 (July 10, 2000) (*"Board Decision"*). The NLRB also found that the Foundation committed an unfair labor practice in firing Hasan for engaging in protected concerted activity.

In *Weingarten*, the Supreme Court held that employees in a unionized workplace may request the presence of a union representative at an investigatory interview which the employee reasonably believes might result in disciplinary action. 420 U.S. at 256, 95 S.Ct. 959. In 1982, in *Materials Research Corp.*, 262 N.L.R.B. 1010, 1982 WL 24684 (1982), the Board extended the *Weingarten* rule to cover employees in nonunion workplaces, holding

that such employees have a right to request the presence of a coworker in an investigatory interview which the employee reasonably believes could result in disciplinary action. This holding was premised on the assumption that an employee's right to assistance emanates from § 7 of the NLRA, rather than from a union's right of representation under § 9. The Board reversed itself in *Sears, Roebuck & Co.,* 274 N.L.R.B. 230, 1985 WL 45768 (1985), holding that *Weingarten* principles do not apply in circumstances where there is no certified or recognized union. Three years later, in *E.I. Dupont De Nemours,* 289 N.L.R.B. 627, 628, 1988 WL 213789 (1988), the Board adhered to the rule enunciated in *Sears,* but acknowledged that "the statute might be amenable to other interpretations." In this case, the Board has come full circle, reimposing the holding of *Materials Research.*

The Foundation claims that the holding in this case is unlawful because it cannot be squared with *Weingarten.* We disagree. The Court's decision in *Weingarten* did not deal with an employee's request for coworker representation in a nonunion setting, and the Board's decision in this case is a reasonable reading of § 7 of the NLRA. An otherwise reasonable interpretation of § 7 is not made legally infirm because the Board gives *renewed,* rather than new, meaning to a disputed statutory provision. It is a fact of life in NLRB lore that certain substantive provisions of the NLRA invariably fluctuate with the changing compositions of the Board. Because the Board's new interpretation is reasonable under the Act, it is entitled to deference. *See United States v. Mead Corp.,* 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

The Board erred, however, in giving retroactive application to its current interpretation of § 7. Employees and employers alike must be able to rely on clear statements of the law by the NLRB. Because, at the time of Borgs' scheduled interview, employees in nonunion workplaces possessed no right to have a coworker present, the Foundation's decision to discharge Borgs for refusing to meet alone with his supervisors was not unlawful under the NLRA. We also reject the Board's determination that the Foundation committed an unfair labor practice when it discharged Hasan for purported protected concerted conduct. The Board's judgment on Hasan is not supported by substantial evidence and it is based on an erroneous application of established law. Hasan was discharged for unprotected, insubordinate behavior.

## I. BACKGROUND

Arnis Borgs and Ashraful Hasan worked as a transition assistant and a transition specialist, respectively, for the Foundation and were both supervised by Rick Berger. After some disagreements with Berger, Borgs and Hasan sent a memorandum to Berger on January 17, 1996 stating:

> As mentioned during earlier discussions (albeit brief) with you, both Dr. Ashraful Hasan and Mr. Arnis Borgs reiterate that your supervision of the program operations performed by them is not required.
>
> Your input to the NIDRR project in the past is appreciated. At this stage, the major area which has to be addressed – deals with outreach. Only support staff assistance is needed in this regard.

Exhibit GC-12, *reprinted in Board Decision,* at 1 n.4. On January 29, 1996, Borgs and Hasan sent a lengthier memorandum to Christine Loehrke, Berger's supervisor, outlining several complaints about Berger's supervision and identifying occasions when Berger acted, in their opinion, inappropriately and unprofessionally. *See* Exhibit GC-13, *reprinted in* Joint Appendix ("J.A.") 209.

Berger then requested to meet individually with Borgs and Hasan. After airing several different proposals, Borgs asked for Hasan to attend a meeting at which he, Berger, and Loehrke were scheduled to attend. Loehrke denied Borgs' request to have Hasan attend the meeting. When Borgs refused to meet without Hasan, Loehrke told him to go home for the day and return the next morning. Borgs returned to work the next day and was fired by Loehrke for refusing to meet with his supervisors. *Board Decision*, at 1-2.

Hasan, unlike Borgs, met with Berger and Loehrke on February 1. At this meeting, Loehrke told Hasan that the memo of January 17 was inappropriate. After the meeting, Hasan received a warning notice from Loehrke stating that Hasan's involvement with the January 17 memo was "gross insubordination" and that any further acts of misconduct or insubordination would result in Hasan's immediate discharge. Loehrke and Hasan met again on February 2 to review the January 29 memo. Subsequently, in March, Hasan refused to sign performance objectives given to him by Berger. On March 25, Hasan was summoned to Loehrke's office and told that he was being discharged. The Administrative Law Judge's ("ALJ") decision notes that,

> [o]n March 29, when he returned to pick up his belongings, [Hasan] was given a letter signed by Loehrke stating that he was terminated for his conduct over the previous nine months, including, refusal to accept supervision on the NIDRR project and various confrontations with staff members. Loehrke testified that Hasan was terminated because he refused to sign a statement of personal project objectives given him by Berger, that his refusal was done "willingly" and "defiantly," that it constituted gross insubordination and subjected him to discharge. The Respondent's brief confirms that the reason Hasan was terminated was his refusal to sign the performance objectives.

*Id.* at 29.

The ALJ determined that because "current Board law" did not extend *Weingarten* rights to nonunion employees, the Foundation's discharge of Borgs did not violate § 8(a)(1). *Id.* at 30. The ALJ likewise held that Hasan's termination was not a violation of the Act because "there was no nexus between Hasan's discharge and protected activity on his part." *Id.* at 31.

The NLRB, by a 3-to-2 vote, reversed the ALJ's finding in part and extended the *Weingarten* rule to nonunion workers. The Board applied this extension retroactively to Borgs' conduct, held that Borgs' request to have a coworker attend the meeting with the supervisor was therefore protected activity, and that the Foundation discharged Borgs for engaging in protected activity in violation of the Act. *Id.* at 4-5. The NLRB, by the same 3-to-2 vote, held that the January 17 and January 29 memoranda were "inextricably intertwined," that both memoranda "related to [Borgs' and Hasan's] conditions of employment," that Hasan was punished for engaging in protected activity, and that the Foundation did not demonstrate that they would have fired Hasan even in the absence of this protected activity. *Id.* at 6-7. The Foundation then petitioned this court for review of the findings of violations on these unfair labor practice charges, and the Board cross-petitioned for enforcement.

## II. ANALYSIS

■ This court must affirm the NLRB's findings of fact if "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e), (f) (1994). And this court must affirm the NLRB's interpretation of the Act "unless it con-

flicts with the unambiguously expressed intent of the Congress or is otherwise not a permissible construction of the statute." *Yukon-Kuskokwim Health Corp. v. NLRB*, 234 F.3d 714, 716 (D.C.Cir.2000) (quotations omitted).

### A. The Weingarten *rule*

The Supreme Court in *Weingarten* held that the NLRB's determination that "§ 7 creates a statutory right in an employee to refuse to submit without union representation to an interview which he reasonably fears may result in his discipline" was "at least permissible under" the Act. 420 U.S. at 256, 266-67, 95 S.Ct. 959. Both union and nonunion employees fall under the protections of § 7 of the Act, *see NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962); however, because *Weingarten* involved a unionized workplace, the Court did not address whether the right extended to workers in nonunion workplaces.

In the years since the Court's decision in *Weingarten*, the Board has changed its position several times in considering whether employees in nonunion workplaces may invoke the *Weingarten* right. In 1982, in *Materials Research*, 262 N.L.R.B. 1010, the Board relied on § 7 of the NLRA and explicitly extended the *Weingarten* rule to a nonunion workplace. The Board held that "the rationale enunciated in *Weingarten* compels the conclusion that unrepresented employees are entitled to the presence of a coworker at an investigatory interview." *Id.* at 1014.

Three years later, in *Sears, Roebuck*, 274 N.L.R.B. at 230 n. 5, 232, the NLRB reversed course completely, holding that the Act "compels" the conclusion that *Weingarten* "applies only to unionized employees." In 1988, in *E.I. DuPont*, 289 N.L.R.B. at 628, the Board once again modified its position, holding that the decision in *Materials Research* extending

*Weingarten* to nonunion workers "represented a permissible construction of the Act, but not the only permissible construction." However, the Board decision in *DuPont* declined to adopt the broad but permissible interpretation, instead holding that *Weingarten* does not extend to "an employee in a nonunionized workplace." *Id.* at 628. Finally, in the case at hand, the NLRB "overrule[d]" *DuPont*, because it is "inconsistent with the rationale articulated in the Supreme Court's *Weingarten* decision, and with the purposes of the Act." *Board Decision*, at 2.

■ On appeal, the Foundation argues that the Board's decision regarding *Weingarten* rests on an impermissible interpretation of the Act. The Foundation's claim is based on three arguments. First, the presence of a coworker in an investigatory interview is neither "concerted" nor "for mutual aid and protection" and, therefore, it is not within the ambit of § 7. Second, the application of *Weingarten* in the nonunion workplace is at odds with § 9(a) of the Act, which provides that "[r]epresentatives designated or selected for the purposes of collective bargaining by a majority of the employees in [an appropriate bargaining unit] shall be the exclusive representatives of all the employees in such unit." 29 U.S.C. § 159(a). Third, the *Weingarten* rule violates the First Amendment rights of nonunion employers to speak individually with their employees. The Foundation advances two additional claims: first, that the interviews at issue in this case were not "investigatory interviews" as defined by *Weingarten*; and, second, that the Board's departure from precedent has not been adequately explained. All of these challenges fail.

Section 7 of the NLRA states that "[e]mployees shall have the right ... to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29

U.S.C. § 157. It follows, therefore, that if "hav[ing] a coworker present at an investigatory interview which the employee reasonably believes might result in disciplinary action," *Board Decision*, at 1, is concerted action for mutual aid or protection, then the Board's decision rests on a permissible construction of the statute. In a unionized workplace, an employee's request for union representation during an investigatory interview is undoubtedly concerted activity for mutual aid and protection. Thus, as noted in *NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 832, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984), even a "lone employee's invocation of a right grounded in his collective-bargaining agreement is ... a concerted activity in a very real sense." The Foundation argues, however, that an *unrepresented* employee cannot invoke any collective rights of the sort found in a unionized workplace, so a request for a coworker's presence during an investigatory interview cannot be viewed as concerted activity for mutual aid and protection. In other words, because a coworker owes no "duty" to a requesting worker, there is no foundation for "concerted" activity. This view of concerted activity is terribly shortsighted.

The NLRB has determined that the act of requesting another's presence at an investigatory interview "enhances the employees' opportunities to act in concert to address their concern 'that the employer does not initiate or continue a practice of imposing punishment unjustly.'" *Board Decision*, at 3 (quoting *Weingarten*, 420 U.S. at 260-61, 95 S.Ct. 959). In other words, the presence of a coworker gives an employee a potential witness, advisor, and advocate in an adversarial situation, and, ideally, militates against the imposition of unjust discipline by the employer. The Board's position also recognizes that even nonunion employees may have a shared interest in preventing the imposition of unjust punishment, and an employee's assertion of *Weingarten* invokes this shared interest. The Board's determination that an employee's request for a coworker's presence at an investigatory interview is concerted action for mutual aid and protection and thus within the realm of § 7 is therefore reasonable. And, as the Supreme Court has made clear, "[i]t is the province of the Board, not the courts, to determine whether or not the 'need' [for a *Weingarten*-type rule] exists in light of changing industrial practices and the Board's cumulative experience in dealing with labor-management relations." *Weingarten*, 420 U.S. at 266, 95 S.Ct. 959.

We agree with the Board that *Weingarten* itself supports the Board's judgment in this case. As the Board noted:

[We were] correct in *Materials Research* to attach much significance to the fact that the Court's *Weingarten* decision found that the right was grounded in the language of Section 7 of the Act, specifically the right to engage in "concerted activities for the purpose of mutual aid or protection." This rationale is equally applicable in circumstances where employees are not represented by a union, for in these circumstances the right to have a coworker present at an investigatory interview also greatly enhances the employees' opportunities to act in concert to address their concern "that the employer does not initiate or continue a practice of imposing punishment unjustly." Thus, affording *Weingarten* rights to employees in these circumstances effectuates the policy that "Section 7 rights are enjoyed by all employees and are in no wise dependent on union representation for their implementation." *Glomac Plastics, Inc.*, 234 N.L.R.B. 1309, 1311, 1978 WL 14203 (1978).

*Board Decision*, at 3 (footnote omitted).

We find no merit in petitioner's claim, which rests on the dissenting opinion of

Board Member Brame, *see id.* at 10, that an extension of *Weingarten* rights to nonunion workers conflicts with § 9(a) of the Act. The Board's response to this argument is compelling:

> Member Brame contends that, by granting a nonunionized employee the right to have a coworker present in an investigatory interview, we are forcing the employer to "deal with" the equivalent of a labor organization, and that this conflicts with the exclusivity principle embodied in Section 9(a) of the Act. This contention was squarely addressed and soundly rejected by the Third Circuit Court of Appeals in *Slaughter v. NLRB,* 794 F.2d 120 (1986). "The entire argument," the court said, "rests upon a non sequitur." *Id.* at 127.
>
> > [T]he system of exclusive representation ... which [it is claimed] ... would be derogated from by the extension of *Weingarten* to the unorganized, is expressly one of collective bargaining, not of dealing. Accordingly, if, as the Supreme Court held, the employer has no statutory duty to bargain with the *Weingarten* representative, the function of that representative in the unorganized setting cannot be in derogation of the exclusivity principle or any other important statutory policy.
>
> *Id.* at 128 [quoting Matthew W. Finkin, *Labor Law by Boz—A Theory of* Myers Industries, Inc., Sears, Roebuck and Co., *and* Bird Engineering, 71 IOWA L.REV. 155, 182 (1985) (footnotes omitted) ]. In other words, even assuming that the role of an employee representative in an investigatory interview is equivalent to "dealing with" the employer, the argument advanced by Member Brame is irrelevant. "Dealing" is not equivalent to "collective bargaining," and the employer is not required to "bargain collectively" with the *Weingarten* representative. As the Third Cir-

cuit held, the Section 9(a) exclusivity principle does not limit the Section 7 rights of nonunionized employees. In any event, if Member Brame insists that we are forcing a nonunionized employer to deal with the equivalent of a labor organization, he must also believe that an employer would violate Section 8(a)(2) of the Act by *voluntarily* allowing an employee to have a coworker present during the investigatory interview. We find this logic to be strained. More important, it misses the point, discussed above, that an employer is completely free to forego the investigatory interview and pursue other means of resolving the matter. Thus, contrary to Member Brame's assertion, there is no obligation to deal with an employee representative of nonunionized employees.

*Board Decision,* at 3-4. There is nothing more to be said on this matter, for the Board decision says it all.

In its brief to this court, the Foundation asserts for the first time that the Board's interpretation of the NLRA places an unconstitutional restriction on employer speech. And at oral argument before the court, counsel for the Foundation argued for the first time that, even if *Weingarten* rights are applicable in a nonunionized workplace, the facts of this case do not implicate *Weingarten.* Neither claim is properly before the court, because neither was raised with the Board in the first instance. Under § 10 of the Act, "[n]o objection that has not been urged before the Board ... shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e); *see Exxel/Atmos, Inc. v. NLRB,* 147 F.3d 972, 978 (D.C.Cir.1998). There are no extraordinary circumstances here. Although the Foundation could not challenge the Board's findings regarding the factual predicates supporting the applica-

tion of *Weingarten* until after the issuance of the Board's decision, it could have objected to the Board's decision in a petition for rehearing. "The failure to do so prevents consideration of the question by the courts." *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982).

Finally, the Foundation argues that the Board has not provided an adequate explanation for its decision. We need not tarry long over this claim, for it is plainly meritless. Apart from the detailed discussions recited above, the Board also relied heavily on its prior decision in *Materials Research* to support the judgment that *Weingarten* rights are applicable in nonunion workplaces. *See Board Decision*, at 3. The Board's conclusion obviously is debatable (because the Board has "changed its mind" several times in addressing this issue); but the rationale underlying the decision in this case is both clear and reasonable. That is all that is necessary to garner deference from the court. "When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 866, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Foundation's challenge here is merely an attack on the wisdom of the agency's policy, and, therefore, the challenge must fail.

## B. Retroactivity

■ The Foundation argues that even if the NLRB's new interpretation of § 7 is upheld, the holding that *Weingarten* rights are applicable in nonunion workplaces should not apply retroactively to impose damages for Borgs' discharge. We agree.

In considering whether to give retroactive application to a new rule, [t]he governing principle is that when there is a "substitution of new law for old law that was reasonably clear," the new rule may justifiably be given prospectively-only effect in order to "protect the settled expectations of those who had relied on the preexisting rule." *Williams Natural Gas Co. v. FERC*, 3 F.3d 1544, 1554 (D.C.Cir.1993). By contrast, retroactive effect is appropriate for "new applications of [existing] law, clarifications, and additions." *Id.*

*Pub. Serv. Co. of Colo. v. FERC*, 91 F.3d 1478, 1488 (D.C.Cir.1996); *see also Aliceville Hydro Assocs. v. FERC*, 800 F.2d 1147, 1152 (D.C.Cir.1986) (discussing the distinction between "new applications of law" and "substitutions of new law for old law").

In light of this governing principle, there is little doubt here that the Board erred in giving retroactive effect to its new interpretation of § 7. At the time when this case arose, the Board's policy on the application of *Weingarten* rights was absolutely clear – employees not represented by a union could not invoke *Weingarten*. Thus, Borgs unquestionably had no right to have a coworker present at an interview with his supervisors. And the employer obviously acted in conformity with the prevailing law in denying Borgs' request to have a coworker present during his scheduled interview. Neither Borgs nor the Foundation could have known for sure that the established law might change, so Borgs acted at his peril in defying his employer and the Foundation acted with no apparent risk in following the law.

In these circumstances, "notions of equity and fairness," *see Cassell v. FCC*, 154 F.3d 478, 486 (D.C.Cir.1998), militate strongly against retroactive application of the Board's "substitution of new law for old law that was reasonably clear," *Aliceville Hydro*, 800 F.2d at 1152. Indeed, it

would be a "manifest injustice" to require the Foundation to pay damages to an employee who, without legal right, flagrantly defied his employer's *lawful* instructions. *See Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1081 (D.C.Cir. 1987). We therefore decline to enforce the Board's decision on retroactivity.

## C. *Substantial Evidence Relating to Hasan's Discharge*

The final issue in dispute concerns the Board's holding that the Foundation committed an unfair labor practice when it reprimanded and discharged Hasan. The Foundation claims that Hasan was disciplined for insubordination. The Board, however, found that the acts of defiance by Hasan and Borgs against their supervisors were merely attempts by the employees to "raise issues related to their conditions of employment." *Board Decision*, at 6-7. Thus, according to the Board, Hasan was engaged in protected concerted activity which was the motivating factor for his employer's decision to reprimand and thereafter terminate him. *Id.* at 6. Because we can find no support in the record for the Board's decision, we reverse.

■ It is well understood that this court must uphold factual findings of the Board if they are supported by substantial evidence. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88, 71 S.Ct. 456, 95 L.Ed. 456 (1951). "The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." *Id.* at 490, 71 S.Ct. 456. Thus, "a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is

substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *Id.* at 488, 71 S.Ct. 456. On the record at hand, we find that the body of evidence opposed to the Board's view is overwhelming.

■ The Foundation reprimanded and then terminated Hasan because of his "gross insubordination" in signing and delivering the January 17 memo to his supervisors, and for his subsequent refusal to sign performance objectives. In the January 17 memo, Borgs and Hasan defiantly "reiterate[d]" to their supervisor that "[his] supervision of the program operations performed by them [was] not required." *Board Decision*, at 1 n.4. This was indisputably an act of gross insubordination, just as the Foundation claims. The Board, however, purports to excuse the insubordination by finding that the employees' January 17 and 29 memoranda were "inextricably intertwined," *see id.* at 6, and that the January 29 memo somehow alleviated the preceding insubordination. This outlandish reasoning draws no support from the evidence in the record.

On January 17, Hasan flatly asserted that he would not recognize the authority of his current supervisor, or any other supervisor for that matter. *See Board Decision*, at 1 n.4 (stating "[o]nly support staff assistance is needed"). The memo contained no specific objections to any terms and conditions of employment, but, rather, simply rejected Berger's supervision. Therefore, the situation here does not fall within the "narrow category of cases" where "the identity of the supervisor is directly related to terms and conditions of employment" and concerted activity "to effect the discharge or replacement of [that] supervisor" may thus be protected. *See NLRB v. Oakes Mach. Corp.*, 897 F.2d 84, 89 (2d Cir.1990). The January 29

memo, sent nearly two weeks later, merely discussed the *opinions and feelings* of Hasan; it did not address Hasan's prior insubordinate *conduct*. Even if Hasan could somehow recast his prior conduct as protected activity, the January 29 memo did not do so, because Hasan never purported to apologize or distance himself in any way from the January 17 memo. At oral argument, counsel for the Board suggested that Hasan and Borgs were simply "inartful" in their objection to their working conditions and that the January 29 memo more accurately explains Hasan's and Borgs' complaints regarding the terms and conditions of their employment. *See also Board Decision,* at 7. This position is wholly untenable. The January 17 memo admits of only one fair reading: Borgs and Hasan told their supervisor that they would not recognize his authority in connection with their work. That was insubordination, not protected concerted activity. Therefore, Hasan was properly reprimanded for this act of insubordination.

Hasan received a written reprimand immediately after his meeting with management on February 1 concerning the January 17 memo. He knew from this written reprimand that he had committed an act of "gross insubordination" and that any further acts of misconduct or insubordination would result in his termination. Despite this fair warning (which, so far as we can tell, he never protested), Hasan subsequently refused to sign performance objectives given to him by his supervisor. He was then fired. The Board does not suggest that Hasan's refusal to sign the performance objectives was protected activity, for it was not. Rather, according to the Board, "the discharge was not solely due to the failure to sign the performance objectives, but rather was linked to the Respondent's anger at Hasan for his protected activity, especially his involvement with the January 17 memo." *Board Decision,*

at 7. The glaring flaw in the Board's reasoning is the erroneous assumption that the January 17 memo was protected. It was not, so the termination of Hasan for his involvement with the January 17 memo and his subsequent refusal to sign performance objectives was not unlawful.

The Board suggests that an "attempt by employees to cause the removal of their supervisor is protected when 'it is evident that [the supervisor's conduct] had an impact on employee working conditions.'" *Id.* at 6. This may be true, but the principle is inapposite in this case. The January 17 memo was a *directive* from Borgs and Hasan to their supervisor that they would no longer recognize his supervisory authority. The memo did not otherwise mention working conditions, nor did it protest that the supervisor's conduct was somehow having an adverse impact on employee working conditions. *See Board Decision,* at 22-23 (dissenting opinion of Member Brame); 31 (ALJ's findings regarding the January 17 memo). The dissenting opinion of Member Hurtgen summarizes the record evidence perfectly:

> In sum, the January 17 memo was unprotected because it sought the discharge of supervisor Berger. There is no showing that the effort to discharge the supervisor was prompted by supervisory conduct affecting employees' terms and conditions of employment. The January 17 memo did not become protected by reason of the later memo of January 29. The [Foundation] was critical of the January 17 memo, and thus Hasan and Borgs wrote another memo on January 29. As the [ALJ] correctly found, this memo was simply an after-the-fact attempt at damage control. In any event, the January 29 letter did not raise the anger of the [Foundation]. Indeed, the [Foundation], through Loehrke, met with Hasan to discuss that memo. It was the January 17 letter

that raised the anger of [Foundation], and that letter was unprotected. *Board Decision,* at 10.

The Board does not have authority to regulate all behavior in the workplace and it cannot function as a ubiquitous "personnel manager," supplanting its judgment on how to respond to unprotected, insubordinate behavior for those of an employer. It is well recognized that an employer is free to lawfully run its business as it pleases. This means that an employer may discharge an employee for a good reason, a bad reason, or no reason, so long as it is not for an unlawful reason. *See NLRB v. Transp. Mgmt. Corp.,* 462 U.S. 393, 394, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) ("The National Labor Relations Act ... makes unlawful the discharge of a worker because of union activity ... but employers retain the right to discharge workers for any number of other reasons unrelated to the employee's union activities."); *Wright Line,* 251 N.L.R.B. 1083, 1089, 1980 WL 12312 (1980) (establishing a test "to determine the relationship, if any, between employer action and protected employee conduct"). Although the Board has considerable leeway in determining the exact scope of protected activity, *see Weingarten,* 420 U.S. at 266, 95 S.Ct. 959, it has no authority to extend the protections of the Act to plainly insubordinate behavior unrelated to the terms and conditions of employment. Because absolutely no evidence supports any nexus between the January 17 memo and any protected activity by Hasan concerning the terms and conditions of his employment, we reverse the NLRB's finding with regard to Hasan.

### III. CONCLUSION

For the foregoing reasons, we deny in part and grant in part the petition for review, and grant in part and deny in part the cross-application for enforcement. We grant the cross-application for enforcement for the Board's decision to extend *Weingarten* under § 7 of the Act to nonunion employees. We reverse the Board's retroactive application of their new interpretation and the Board's findings that the Foundation discharged Borgs and Hasan for engaging in protected activity.

*So ordered.*