# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 1, 2005          Decided January 20, 2006

No. 04-1366

DETROIT NEWSPAPER AGENCY, *D/B/A* DETROIT NEWSPAPERS,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

Consolidated with
04-1403

On Petition for Review and
Cross-Application for Enforcement
of an Order of the National Labor Relations Board

*Robert M. Vercruysse* argued the cause for petitioner. With
him on the briefs were *William E. Altman* and *Gary S. Fealk.*

*Fred B. Jacob*, Attorney, National Labor Relations Board,
argued the cause for respondent. With him on the brief were
*John H. Ferguson*, Associate General Counsel, *Aileen A.
Armstrong*, Deputy Associate General Counsel, and *William M.
Bernstein*, Senior Attorney.

Before: HENDERSON, *Circuit Judge,* and EDWARDS[*] and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

Dissenting opinion filed by *Circuit Judge* HENDERSON.

EDWARDS, *Senior Circuit Judge*: Detroit Newspaper Agency d/b/a Detroit Newspapers ("Company" or "Detroit News") petitions this court for review of an order of the National Labor Relations Board ("Board" or "NLRB"), and the Board cross-applies for enforcement. On charges filed by the Detroit Mailers Union No. 2040, International Brotherhood of Teamsters, AFL-CIO ("Union" or "Local 2040"), a divided panel of the Board held that Detroit News committed an unfair labor practice in violation of §§ 8(a)(1) and (3) of the National Labor Relations Act ("Act" or "NLRA"), 29 U.S.C. § 158(a)(1), (3) (2000), by discharging Union member and former striker Thomas Hydorn. *Detroit Newspaper Agency, D/B/A Detroit Newspapers v. Detroit Mailers Union No. 2040, Int'l Bhd. of Teamsters, AFL-CIO*, 342 N.L.R.B. No. 125, 2004 WL 2203014 (Sept. 28, 2004) ("*Detroit News*"). The Board specifically found that, despite Hydorn's blatant act of insubordination, Detroit News' decision to terminate his employment was motivated in part by Hydorn's protected union activity, and that Detroit News failed to prove it would have fired him even in the absence of this activity. Consequently, the Board ordered Detroit News, among other things, to cease and desist its unfair labor practice and reinstate and make whole Hydorn for any lost earnings he suffered as a result of his unlawful discharge. *Id.* at *7.

In concluding that Detroit News violated the Act, the Board purported to apply the two-prong test set forth in *Wright Line*,

---

[*] Senior Circuit Judge Edwards was in regular active service at the time of oral argument.

251 N.L.R.B. 1083 (1980). *Wright Line* outlines the general framework for assessing whether an employee's discharge that turns on employer motivation violates § 8(a)(3) (and by extension § 8(a)(1)) of the Act. As the Board explained:

> [T]he General Counsel must first persuade, by a preponderance of the evidence, that an employee's protected conduct was a motivating factor in the employer's decision.

> If the General Counsel makes such a showing, the burden of persuasion shifts "to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct."

*Detroit News*, 2004 WL 2203014, at *3 (quoting *Wright Line*, 251 N.L.R.B. at 1089).

Detroit News argues that the Board lacked the substantial evidence necessary to find that the General Counsel met its burden of proof on the first prong of *Wright Line*. As we read the Board's decision, Detroit News certainly seems to be correct. None of the Board's three findings that are offered to show that Hydorn's protected conduct was a motivating factor in the employer's decision to fire him appear to be supported by substantial evidence.

In the Board's brief and at oral argument, however, Board counsel argued that the Board also relied implicitly on a *fourth* justification – that Hydorn was treated differently than non-union adherents who had committed the same offense – in support of its conclusion that Hydorn's protected conduct was a motivating factor in his discharge. This claim is not articulated in the section of the Board's decision discussing the first prong of *Wright Line*. It is examined, however, in the Board's analysis of the second prong of *Wright Line*. We do not know what to make of the Board's decision. In situations where we cannot discern "the precise basis upon which the Board

rested in reaching its conclusion[,] . . . . meaningful judicial review requires us to remand the case to the Board for clarification of its position on the . . . issue." *Palace Sports & Entm't, Inc. v. NLRB*, 411 F.3d 212, 224-25 (D.C. Cir. 2005). We therefore reserve judgment on the merits of the Board's order and remand the case for further consideration consistent with this decision.

## I. BACKGROUND

### A. *Factual Background*

The events leading to this case occurred at Detroit News' "North Plant," a printing facility located in Sterling Heights, Michigan, a suburb north of Detroit. One of the North Plant's production functions is the placement of advertising supplements into the newspapers and comics produced by Detroit News. This process is facilitated by "insert machines," which are manned by multiple "material handlers" (or "mailers") and one machine "operator."

At various points around the insert machines, there are "heads," which contain the supplements. The advertising inserts at each head drop into buckets that travel in a circuit around the machine between the various heads. At the conclusion of the circuit, the bottom of each bucket opens and drops the section onto a conveyor. This conveyor then transports the section to a "stacker," a machine that readies the sections to be tied together and placed onto trucks for delivery.

Material handlers work at the heads positioned around the machine. They are responsible for loading the advertising inserts into the heads, and may be assigned to more than one head at a time. The operators, who are stationed at a computer at one end of the machine, are responsible for directing the work group and running the computer that helps the machine function properly.

A common challenge faced by operators occurs when a "paper drag" stops the operation. This happens when one of the buckets opens up to release the insert onto the conveyor line, but closes before the paper falls completely through. The bucket then drags the trapped insert around the insert machine circuit. When this occurs, a sensor shuts down the machine until the paper drag is cleared by removing the misfed paper and, if necessary, resetting the machine.

Thomas Hydorn began working for Detroit News in 1978, when he took a part-time position in the mailroom. Hydorn worked his way up to full-time status, becoming a material handler, a position he occupied for 12 to 15 years. For the most part, Hydorn had an unblemished personnel record, earning only one disciplinary notice – for absenteeism – while he was a part-time employee. Prior to the incident that led to his discharge in August 1999, Hydorn received no other discipline of any kind.

In 1995, Hydorn was one of many Detroit News employees who participated in a strike when negotiations between the Company and various unions, including Local 2040, reached an impasse. Hydorn was neither a Union leader nor an otherwise prominent member of the striking unit, although he did participate in picketing the Company. In February 1997, after the strike proved fruitless, the Union made an unconditional offer on behalf of strikers to return to work. Hydorn and the other striking workers were not permitted to return immediately, because Detroit News had hired replacement workers to take their jobs during the strike. The striker replacements were retained at the end of the strike and returning strikers were placed on a preferential hiring list. *See Detroit Typographical Union No. 18 v. NLRB*, 216 F.3d 109, 115 (D.C. Cir. 2000).

Hydorn was eventually rehired to his former position as a material handler in August 1999, two and a half years after the strike had ended. Prior to the resumption of his duties, Hydorn was required to attend an orientation conducted by Company

Post-Press Director Karen Zemnickas, the North Plant management official in charge of the work and discipline of the Local 2040 members. At the orientation, Zemnickas discussed the material handlers' duties and distributed supplementary written materials. She told the returning employees that they should do the job as they had done it before, although they may now be called upon to work at more than one station. During this reorientation training, Zemnickas overlooked one important change in the material handler job, which required the handlers – as opposed to the operators, whose responsibility it had been in the past – to clear any paper drags that occurred. In addition, the new rule required that the handler nearest the paper drag was obligated to remove it.

On the evening of August 24, 1999, shortly after Hydorn returned to work, he was assigned to an insert machine with fellow material handler John Dutka and operator William Mihalik. While some of the material facts relating to what occurred on this evening are in dispute, we will assume, for the purposes of this analysis only, that the Board's version of the events is correct.

Midway through the night shift, at about 1:00 a.m., a paper drag occurred near the stations at the insert machine where Hydorn and Dutka were working. Mihalik signaled the two men by calling out "paper drag" and told them to clear it. In accordance with Detroit News policy, since Dutka was closer to the machine, the paper drag was his responsibility. Dutka therefore left his work station and cleared it. Upon witnessing Dutka's action, Hydorn, who was under the impression that clearing paper drags was the operator's duty, told Dutka not to do it. Hydorn then pointed at Mihalik and told Dutka that it was the operator's "f__king job" and that was why he got paid the "big f__king dollars." *Detroit News*, 2004 WL 2203014, at \*2. Mihalik responded to this verbal assault by summoning one of the night shift supervisors, Casey Leach.

When Leach arrived and was apprised of the situation by Mihalik, he informed Hydorn that it was, in fact, the material handlers' job to clear paper drags. An insolent Hydorn replied that he would not clear them, even if it meant that he would be suspended or fired. Leach then brought over another supervisor, Louis Monroig, who was the acting post-press manager. Monroig asked Hydorn if he understood that Leach had given him a direct order, and Hydorn again stated that he would not remove paper drags, because that was not his job. Monroig then demanded that Hydorn follow him to his office, at which point Hydorn requested Union representation.

Shortly thereafter, Monroig and Leach met in the office with Hydorn and Harold Sorenson, a Union Steward. Sorenson confirmed to Hydorn that it was, in fact, his responsibility to clear paper drags. Hydorn held steadfast in his insistence that it was the operator's job, however, and told both Leach and Monroig that he simply would not do it. As a result, Monroig suspended Hydorn and told him to turn in his identification card. Hydorn surrendered his card to Sorenson and was escorted out of the plant.

Later that morning, Zemnickas was informed about the Hydorn incident while attending a Company golf outing. While at the outing, Zemnickas met with the North Plant Post-Press Manager, Mike Martin, and the Company's Senior Legal Counsel and Labor Relations Director, John Taylor. Zemnickas then interviewed Monroig and Leach, and had them submit written statements. Zemnickas did not speak with Hydorn, Mihalik, or Dutka.

After receiving all of the relevant information, Zemnickas again consulted with Taylor, and determined that Hydorn should be discharged. The Company issued a discharge letter to Hydorn on August 27, informing him that he was being terminated due to his "refusal to follow the instructions and the direct order given by [his] supervisor." Letter from Mike

Martin, Post-Press Manager, Detroit Newspapers, to Thomas Hydorn (Aug. 27, 1999) ("Discharge Letter"), Joint Appendix ("J.A.") 60.

The Union responded by filing a formal grievance with the Company on September 1, 1999. At a grievance meeting held between the parties on October 8, 1999, Hydorn apologized for his behavior and stated that he had been guilty of having a "bad attitude." Br. for NLRB at 11. Detroit News nevertheless rejected Hydorn's appeal on October 21, 1999, reiterating that Hydorn "refus[ed] to follow the instructions of his supervisor." *See* Letter from John A. Taylor, Detroit Newspapers, to Alex Young, Detroit Mailers Union No. 2040 (Oct. 21, 1999), J.A. 65.

## B. *The Board's Decision*

After failing to overturn Hydorn's discharge through an internal grievance procedure, the Union filed an unfair labor practice charge against Detroit News, alleging that Hydorn's discharge violated §§ 8(a)(1) and (3) of the Act. An Administrative Law Judge ("ALJ") presided over a two-day hearing on March 14-15, 2000, and found that Hydorn was discharged unlawfully "because of his union and protected activities." Decision (June 21, 2000), slip op. at 15, J.A. 19. Detroit News appealed the ALJ's decision to the Board.

More than four years later, a three-member panel of the Board issued a 2-1 decision upholding the ALJ's finding that Hydorn was discharged in violation of the Act. *Detroit News*, 2004 WL 2203014, at *1. Through the application of the two-prong *Wright Line* formula, the Board found that: (1) Hydorn's participation in the strike was a motivating factor in his discharge, and (2) the Company's assertion that it would have fired Hydorn regardless of any alleged antiunion animus was undercut by evidence of its disparate treatment of Hydorn. *Id.* at *4.

The Board's conclusion under the first prong of *Wright Line* explicitly relied on three elements of the Union's case. First, the Board asserted that "Hydorn was disciplined for misconduct he did not commit." *Id.* at *5. According to the Board, Detroit News informed Hydorn that he was being fired because he "refus[ed] to follow the instructions and the direct order given by [his] supervisor." *Id.* (quoting Discharge Letter, *supra*, J.A. 60). The Board concluded that this was a "false" reason for the termination, because Hydorn "never defied a direct order to remedy a *pending* paper drag," just a hypothetical one. *See id.* (quotation marks omitted) (emphasis added). Thus, according to the Board, Hydorn could not have refused to follow a "direct order."

The Board also found the "backdrop" against which the discharge took place to be suggestive of an unlawful Company motive. *Id.* at *4. The Board noted that the Union's strike had been "prolonged and bitter" and spawned numerous unfair labor practice charges, and Union members were forced to return to work without an agreement. *Id.* The Board contended that the strikers returned to "altered working conditions," which among other things, left them without the benefit of their former seniority system. *Id.* In addition, the Board credited comments allegedly made by Monroig to Union Steward Sorenson that "the strike had been a mistake, their return was an 'unconditional surrender,' the unions were at fault, and that union employees had ruined everything." *Id.*

Finally, the Board found that Detroit News failed both to "investigate fully the circumstances surrounding Hydorn's suspension," *id.* at *5, and "consider whether Hydorn's offense warranted application of its progressive discipline policy," *id.* at *6. In terms of the Company's investigation, the Board claimed that it neglected to follow its "own guidelines" for employee discipline. *Id.* at *5. These "guidelines" were not formally promulgated procedures; rather, they were the themes allegedly

discussed by John Taylor, Detroit News' senior legal counsel, at a workshop he conducted on disciplinary issues held the morning prior to the Hydorn incident. In the notes prepared for the seminar, Taylor outlined that an internal investigation should be "thorough" and should provide the subject of the investigation with an "opportunity to respond." *Id.* (quoting John A. Taylor, Labor/Legal Issues Workshop, Detroit Newspaper Agency (Aug. 24, 1999), J.A. 138 ("Taylor Workshop")). The Board found that Detroit News' investigation failed to meet either of these requirements, as Zemnickas's review of the incident canvassed only management employees, and never involved a statement from Hydorn. For the Board, that review was "cursory," and was further evidence of antiunion animus. *Id.* The Board also found that the Company's subsequent choice of punishment was impulsive, as Zemnickas did not take into account that this was Hydorn's "first offense for insubordination," and that he had a good personnel record throughout his tenure with the Company. *Id.* at *6.

Once the Board determined that the General Counsel met its burden of proving that Hydorn's protected activity served as a substantial factor in the Company's decision to discharge him, it then moved to *Wright Line*'s second prong and questioned whether Detroit News could show that it would have taken the same action even in the absence of Hydorn's protected activity. The Board concluded that the Company's second-prong defense fell short, because it found that Detroit News "engaged in disparate treatment in disciplining Hydorn." *Id.* at *7. Specifically, the Board found the record replete with evidence that "the [Company] treated Hydorn more harshly than nonstrikers . . . who engaged in similar conduct." *Id.*

In light of these findings, the Board ordered Detroit News to cease and desist from discharging or otherwise discriminating against employees in order to discourage union activity. In

addition, it ordered the Company to offer Hydorn full reinstatement and to make him whole for any loss of earnings that he may have suffered due to the Company's discrimination.

## II. ANALYSIS

### A. *The Board's Case Under* **Wright Line***'s First Prong*

Detroit News argues that the Board's *Wright Line* analysis should not have advanced beyond the first prong, as the Board's General Counsel was unable to establish any concrete connection between Hydorn's protected activity – his participation in the strike from 1995-97 – and his eventual discharge. The Company takes exception to each of the Board's findings supporting its justification for the conclusion that Hydorn's protected conduct was a motivating factor in his discharge. Whether taken separately or as a whole, Detroit News asserts that the record evidence clearly shows that Hydorn was fired solely for his blatant insubordination.

Our review of the Board's findings of fact is limited to whether they are "'supported by substantial evidence on the record considered as a whole.'" *Palace Sports*, 411 F.3d at 220 (quoting 29 U.S.C. § 160(e)-(f) (2000)). But while the "Board's findings are entitled to respect[,] . . . they must nonetheless be set aside when the record . . . clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490 (1951). "Thus, 'a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.'" *Epilepsy Found. of Ne. Ohio v. NLRB*, 268 F.3d 1095, 1103 (D.C. Cir. 2001) (quoting *Universal Camera*, 340 U.S. at 488).

As noted above, the Board offered three primary reasons for holding that the General Counsel met its burden of proving that Hydorn's protected activity was a motivating factor in his discharge. We evaluate each of the Board's contentions below.

1. *Discharge for Misconduct*

Hydorn was informed by letter that his discharge was the result of his "refusal to follow the instructions and the direct order given by [his] supervisor." Discharge Letter, *supra*, J.A. 60. It is undisputed that Hydorn *repeatedly* told his supervisors that he would *never* perform the required work. This defiance continued even after the supervisors' position was confirmed by the Union Steward, whose presence Hydorn requested. Indeed, Hydorn went so far as to say that the employer would have to fire him before he would comply. Therefore, the discharge letter was accurate in stating that Hydorn had refused to follow the instructions and direct orders of his supervisors.

This notwithstanding, the Board found that "the Respondent's stated reason for discharging Hydorn is false." *Detroit News*, 2004 WL 2203014, at *5. Why? Because, according to the Board, "while Hydorn may have exhibited insubordinate behavior on August 25, we agree with the [ALJ] that 'he never defied a direct order to remedy a pending paper drag.'" *Id*. (quoting Decision, slip op. at 11, J.A. 15). At oral argument, the Board's counsel attempted to explain the Board's theory: "Who knows what would have happened if they had actually let [Hydorn] . . . . process the papers? He may have agreed to do it." Recording of Oral Argument at 19:46.

The Board's claim is disingenuous. Hydorn precipitated the incident leading to his discharge by stating, in unequivocal terms, that he would not perform the specific, clearly delineated duties associated with his job. An employee like Hydorn can refuse to follow a direct order to perform specific work that is pending at the time the order is given, or he can refuse to

perform that work when it arises in the future. In either case, the refusal to perform the duties of the job is a flagrant act of insubordination. In other words, in either instance, an employee who, like Hydorn, says he will not perform work that is within the compass of his assigned duties has flatly defied the instructions of management. The orders given to Hydorn were not hypothetical and neither were Hydorn's refusals. Therefore, we find that Detroit News' discharge notice to Hydorn was not "false," as the Board found, in stating that Hydorn was fired for his "refusal to follow the instructions and the direct order given by [his] supervisor."

### 2. *The "Backdrop" of the Discharge*

To support its contention that the acrimonious "backdrop" of the discharge was evidence of discriminatory motive, the Board referenced the "prolonged and bitter" strike and the antiunion sentiments allegedly expressed by a Company supervisor. Without more, however, these claims are virtually meaningless. The strike ended over two and a half years prior to Hydorn's return, and there is nothing in the record to indicate that there was reason for the Company to single out Hydorn for negative treatment. The only evidence offered was that Hydorn had "picketed" along with many other striking Union members. It was never alleged, however, that he was a Union leader or that he had any exceptional run-in with the Company as part of his Union activity. Nothing indicates that he was singled out for bad treatment when he returned to work. And there is not one iota of evidence relied upon by the Board in its first-prong *Wright Line* analysis to suggest that the employer engaged in a pattern or practice of negative treatment aimed at returning strikers.

The alleged antiunion statements made by supervisor Monroig also offer little to the Board's case. First, it is unclear whether Monroig actually uttered those statements, as the lone testimony supporting this claim came from Union Steward

Harold Sorenson, who the ALJ found to be "very lacking in credibility." *See* Decision, slip op. at 8, J.A. 12. And while the Board notes that the ALJ credited Sorenson's testimony "where it was not contradicted by other witnesses," *see Detroit News*, 2004 WL 2203014, at *4 n.7, it failed to note that the ALJ did not rely on Sorenson's Monroig testimony to support his finding of antiunion animus. Second, it appears that those alleged statements were made only to Sorenson. *See* Trial Tr. at 203 (3/14/00), J.A. 355. Monroig's alleged passing comments to Sorenson hardly constructed a viable "backdrop" against which to assess the Company's discipline of Hydorn. Finally, Monroig was not directly involved in the final decision to terminate Hydorn, so any potential impact he had on that decision was necessarily circumscribed.

### 3. *Failure to Investigate and Progressive Discipline*

The Board's final rationale supporting its first-prong decision is that Detroit News both failed to "thoroughly" investigate the incident leading to Hydorn's suspension and discharge, thereby contravening its own "guidelines," and neglected to adhere to its "progressive discipline policy." *Detroit News*, 2004 WL 2203014, at *5-6. These arguments are red herrings. The Board does its best to paint Taylor's seminar as installing mandatory guidelines for disciplinary review, but that implication is specious. The Board has not cited any agreed-upon termination procedure between the Union and the Company, and puts forth no cogent reason for why Taylor's alleged departure from his written seminar outline is evidence of antiunion animus. Indeed, Detroit News was not obliged to "investigate" Hydorn's case in any particular way, and further, the Board offers nothing material that the employer would have uncovered had it investigated the matter differently.

In addition, there is no evidence that Detroit News promulgated a "progressive discipline" policy that limited the

action that it could take against Hydorn. We made clear in *Epilepsy Foundation of Northeast Ohio v. NLRB* that

> [t]he Board does not have authority to regulate all behavior in the workplace and it cannot function as a ubiquitous "personnel manager," supplanting its judgment on how to respond to unprotected, insubordinate behavior for those of an employer. It is well recognized that an employer is free to lawfully run its business as it pleases. This means that an employer may discharge an employee for a good reason, a bad reason, or no reason, so long as it is not for an unlawful reason.

268 F.3d at 1105.

In short, the three reasons relied upon by the Board to justify its finding that the General Counsel met its burden under the first prong of *Wright Line* are not supported by substantial evidence. Without more, they fail to meet the necessary threshold to support a conclusion that antiunion animus was a motivating factor in Hydorn's discharge.

## B. *The "Fourth" Rationale Under* Wright Line*'s First Prong*

In its brief and at oral argument, counsel for the Board, apparently recognizing that the Board's decision was fragile in its analysis of the first prong of *Wright Line*, argued that the Board had *implicitly* relied upon a fourth reason to show that antiunion animus was a motivating factor in the Company's discharge of Hydorn: his disparate treatment in comparison to nonstrikers who had committed similar or more egregious acts of insubordination. *See* Br. of NLRB at 25-29; Recording of Oral Argument at 20:43. It is true that the Board found that

> the General Counsel has produced significant evidence of disparate treatment. Based on Respondent's personnel records, the General Counsel has shown that between

February, 1997 and November 1999, Respondent disciplined 37 nonstrikers for insubordination less harshly than Hydorn. In 20 of those 37 instances, the Respondent only issued a warning to the offending employee, while in the remaining cases the employees were disciplined with suspensions. We agree with the judge that "the evidence in this case shows that the Respondent had a relatively lax attitude towards insubordination by non-strikers, even those who defied multiple direct orders or had been insubordinate on prior occasions."

*Detroit News*, 2004 WL 2203014, at *7 (quoting Decision, slip op. at 12, J.A. 16). The Board argues in its brief that this finding clearly supports the Board's conclusion that antiunion animus was a motivating factor in Hydorn's discharge. *See* Br. for NLRB at 29.

The problem with this argument is that the Board's analysis of the alleged disparate treatment comes under the section of its decision dealing with the *second prong* of the *Wright Line* test, not in the section addressing whether the General Counsel met its burden of proving that the employee's protected conduct was a motivating factor in the employer's decision. In other words, the Board's sole references to the alleged disparate treatment appear when the Board discusses whether the employer met its burden to demonstrate that the same disciplinary action would have taken place even in the absence of Hydorn's protected conduct.

Thus, at least *as written*, the Board's decision does not present substantial evidence to support the conclusion that Hydorn's protected conduct was a motivating factor in his discharge. Rather, it appears that Hydorn was dismissed for insubordination. In this circumstance, we would normally reverse the Board's decision, because the reasons given by the Board do not support the result reached. And we must accept the Board's decision on it own terms, ignoring post-hoc

rationalizations by counsel and rejecting the temptation to supply reasons to support the Board's decision that the Board itself has not offered. *See SEC v. Chenery Corp.*, 318 U.S. 80, 89-90 (1943). Two things give us pause, however.

First, at the beginning of its decision, the Board summarizes the applicable law, as follows:

> The elements the Board considers when determining whether an employer's conduct was discriminatorily motivated are generally the alleged discriminatee's protected activity, employer knowledge of that activity, and union animus. . . . Under certain circumstances the Board will infer animus in the absence of direct evidence. That finding may be inferred from the record as a whole. *The Board has further stated that evidence of a blatant disparity is sufficient to support a prima facie case of discrimination.*

*Detroit News*, 2004 WL 2203014, at \*4 (internal citations and quotation marks omitted) (emphasis added). Although the Board did not explicitly cite any "blatant disparity" as one of the factors showing that the employer acted pursuant to unlawful motivation in dismissing Hydorn, it is nonetheless clear that the Board recognized that disparate treatment in disciplinary actions might be a factor.

Second, in the latter half of the decision, dealing with the second prong of *Wright Line* (and the employer's burden of proof), the Board found that "*the General Counsel has produced significant evidence of disparate treatment.*" *Id.* at \*7 (emphasis added). It is unclear what to make of this, and it is certainly hard to fathom why the Board failed to make this same point in its analysis of the first prong of *Wright Line*. Poor draftsmanship or inadvertence are possible explanations. It is also possible that the Board made a tactical decision to leave the discussion of disparate treatment until the second half of the *Wright Line* analysis because, of all its arguments, it is the most

pertinent to the Company's affirmative defense. Whatever the reason, the Board misfired, and its analysis as currently constituted is not sufficiently clear to allow for meaningful review.

Because we do not know what to make of the Board's decision, we remand the case for clarification and further consideration. On remand, the Board must first explain whether the evidence suggesting disparate treatment in discipline is among the factors that the Board meant to consider in concluding that the General Counsel met its burden of demonstrating that antiunion animus was a motivating factor in the Company's discharge of Hydorn. In particular, the Board must explain how this evidence satisfies the burden that the General Counsel carries. Second, if the Board meant to include disparate treatment in discipline in analyzing the first prong of *Wright Line*, the Board must consider whether it would still reach the same result in light of this court's holding that its other three findings are not supported by substantial evidence. We express no opinion on the substantive validity of the Board's findings on disparate treatment. The Board may amplify the point as necessary on remand.

We offer no judgment on the correct result in this case. The Board must make this determination in the first instance on remand. We do note, however, that the Board may, if appropriate, change its judgment on reconsideration and dismiss the unfair labor practice charges.

### III. CONCLUSION

For the foregoing reasons, the case is hereby remanded to the Board for further clarification.

*So ordered.*

KAREN LECRAFT HENDERSON, *Circuit Judge*, dissenting:

The majority has decided to remand this case to the Board because it ultimately concludes that it "do[es] not know what to make of the Board's decision." Maj. op. at 18. This, after six pages meticulously detailing the inadequacies of that decision. *See id.* at 12 ("The Board's claim is disingenuous."); *id.* 14 ("These arguments [of the Board] are red herrings."); *id.* 15 ("In short, the three reasons relied upon by the Board to justify its finding that the General Counsel met its burden under the first prong of *Wright* Line are not supported by substantial evidence."); *id.* 15 (The Board "fail[s] to meet the necessary threshold to support a conclusion that antiunion animus was a motivating factor in Hydorn's discharge."); *id.* 16 ("[T]he Board's decision does not present substantial evidence . . . In this circumstance, we would normally reverse the Board's decision, because the reasons given by the Board do not support the result reached."). But it earlier correctly characterized the Board's order, namely "the Board misfired." *Id.* at 17-18. In other words, the Board's decision is wrong. When that happens, our duty is to grant the petition for review pure and simple. We have no warrant to allow an agency to patch the holes in an insufficient order, much less to "amplify . . . as necessary on remand," *id.*, the "substantive validity" of its critical finding, *id.* While in certain limited circumstances we have remanded to an agency for further action, never have we done so where, as here, the majority itself categorically denounces the sufficiency of the order under review. *C.f. Lee Lumber & Bldg. Material Corp. v. NLRB*, 117 F.3d 1454, 1460 (D.C. Cir. l997) (on remand for failure to explain departure from its standard, Board had choice to vacate order or explain why order was necessary given facts of case). Because the Board's decision is not supported by substantial evidence, as the majority acknowledges, *see* maj. op. at 16 ("[T]he Board's decision does not present substantial evidence to support the conclusion that Hydorn's protected conduct was a motivating

factor in his discharge."), I would grant Detroit News's petition for review. Accordingly, I respectfully dissent.

The Board order plainly did not consider evidence of disparate treatment during the first step of the *Wright Line* analysis; "Thus, at least *as written*, the Board's decision does not present substantial evidence to support the conclusion that Hydorn's protected conduct was a motivating factor in his discharge." *Id.* (emphasis in original). My colleagues, however, do not take the Board at its word and instead uncover ambiguity from two sentences in the Board's 5,000 word opinion. To them, the Board's general observation that "evidence of a 'blatant disparity is sufficient to support a prima facie case of discrimination,' " coupled with one sentence in its discussion of *Wright Line* step two, renders the Board order "not sufficiently clear to allow for meaningful review." *Id.* at 18. In so concluding, they accept the Board's *post hoc* rationalization for its analytically flawed decision.

No principle is better-settled in administrative law than that we are to uphold an agency order based *only* on reasoning fairly stated by the agency in the order under review. *See SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943). "[P]ost hoc rationalizations by agency counsel will not suffice." *W. Union Corp. v. FCC*, 856 F.2d 315, 318 (D.C. Cir. 1988). Unlike a district court's decision, that of an administrative agency cannot be sustained on a ground the agency did not consider—the agency's decision must stand or fall upon *its* reasoning. *See Ind. Hosp., Inc. v. NLRB*, 10 F.3d 151, 155 (3d Cir. 1993); *NLRB v. P\*I\*E Nationwide, Inc.*, 923 F.2d 506, 517-18 (7th Cir. 1991).

Here, *the Board's* reasoning did not rely on evidence of disparate treatment. It discussed only three factors in its *Wright Line* step one analysis: (1) Hydorn's termination occurred against a backdrop of anti-striker animus; (2) the Company's stated reason for Hydorn's discharge was false;

and (3) the Company failed to follow its own investigative and disciplinary procedures. *Detroit Newspaper Agency*, 342 N.L.R.B. No. 125, slip op. at 4-5 (2004). That its finding of a *prima facie* case was not based on evidence of disparate treatment is further supported by its summary of the *prima facie* case, from which, again, any mention of disparate treatment is conspicuous by its absence. Furthermore, the General Counsel presented no evidence of disparate treatment in litigating the *prima facie* case before the ALJ.[1]

I fail to see how the majority discerns ambiguity from the two sentences it cites in light of the Board's unambiguously articulated justifications for its *Wright Line* step one finding, *id.*, whether the sentences are viewed in isolation or taken together. The first sentence contains a reference to disparate treatment in an introductory paragraph listing various components of the *prima facie* showing. *Id.* at 3. In isolation, it is classic boilerplate; and, when coupled with the second sentence that appears in the Board's discussion of disparate treatment evidence in *step two*, it still does not support the conclusion that the Board considered it as part of the *prima facie* showing. Detroit News rebutted the General Counsel's *prima facie* case with evidence of six non-striking employees it also terminated for insubordination. *Id.* at 5-6. The Board rejected the Company's rebuttal, noting that "we are unable to conclude from the Respondent's evidence that it evaluated Hydorn's misconduct according to the same standard applied to employees who did not engage in protected activities." *Id.* at 5. Following this sentence, the Board discussed the General Counsel's disparate treatment evidence. *Id.* It ultimately concluded that Detroit News "had a relatively lax attitude towards insubordination by non-strikers, even those who defied multiple direct orders or had been insubordinate

---

[1]In addition, the General Counsel did not allege disparate treatment in the complaint. *See* J.A. 47-51.

on prior occasions." *Id.* The Board did not relate this evidence to the *prima facie* case but instead to the *step two* analysis, which makes complete sense in relation to the Company's rebuttal.

Even assuming the Board's discussion of disparate treatment could properly be considered as having been directed to the *prima facie* showing stage, that showing would nonetheless be unsupported by substantial evidence. The record reveals that, at worst, Detroit News was inconsistent in disciplining insubordinate employees; more accurately, it manifests that Hydorn was treated no differently from non-strikers who engaged in behavior as high-handed as Hydorn's. According to the Board, the General Counsel produced evidence that, between February 1997 and November 1999, the Company "disciplined 37 non-strikers for insubordination less harshly than Hydorn." *Id.* The difficulty with the Board's conclusion is that it assumed all types of insubordination are alike.[2] While in 20 of the 37 instances, Detroit News simply reprimanded the employee, nearly one-half involved employees who filed paperwork late and another two involved employees who would not work overtime. The Board emphasized the fact that the other 17 employees were suspended—not terminated—but it omitted to mention that there were *strikers* who had also been suspended—not terminated—for insubordination. *Id.* In fact, from 1997 to 1999, seven employees in all were terminated

---

[2]The dissenting Board member reminded his colleagues of their limited ability to evaluate workplace imbroglios after the fact: "However, it is not our place to second-guess personnel decisions; our sole responsibility is to determine whether the General Counsel has established by a preponderance of the evidence that discriminatory animus was a substantial or motivating factor in the challenged disciplinary action." *Detroit Newspaper Agency*, 342 N.L.R.B. No. 125, slip op. at 7 (Schaumber, Member, dissenting) (2004).

for insubordination. *Id.* Only *one* was a returning striker and that was Hydorn.

The Board discounted this evidence, claiming that five of the six incidents involved termination for more than a single act of insubordination. *Id.* But, as the dissenting Board member convincingly explained, the conduct of two *non*-strikers was on par with Hydorn's. *Id.* at 11. The discharge letter sent to non-striker Sylvia Dean referenced only one incident when she "refused to follow the instructions of … [her] supervisor[] and perform the work on the machine assigned to [her]." *Id.* Detroit News's concern was the same with Dean as it was with Hydorn: "it appears from the foregoing that you are not willing to meet the duties, responsibilities and proper conduct required of you in your job." J.A. 129. The Board distinguished the discharge of non-striker Usman Daramay because he was terminated for both refusal to obey an order and "inappropriate behavior." Apparently, Daramay's "inappropriate behavior" was the "additional" factor that contributed to the Company's termination decision. It is undisputed that Hydorn was guilty of "inappropriate behavior" too. Indeed, even Hydorn admitted that he had a "bad attitude." *Detroit Newspaper Agency*, 342 N.L.R.B. No. 125, slip op. at 2. Because Hydorn's attitude was not *separately* listed in the discharge letter, however, the Board found the two cases distinguishable. Nevertheless, as the record indicates, *see* J.A. 665-66, Taylor considered Hydorn's attitude as well as the written statements of Leach and Monroig in deciding to fire him.[3]

---

[3]Taylor testified that he took into account Hydorn's "attitude," which was "[g]o ahead and fire me. Because I am not going to [clear paper drags] today and I am not going to do it tomorrow." J.A. 665. *See Detroit Newspaper Agency*, 342 N.L.R.B. No. 125, slip op. at 11 (Schaumber, Member, dissenting) ("No one can reasonably dispute that Hydorn engaged in conduct Respondent deemed 'inappropriate'

6

The majority's decision to remand this case to the Board "for elaboration" skirts decades of case law declaring that we can uphold an agency decision only upon the articulated rationale of the agency. I believe that the Board in fact articulated its rationale and that rationale is not supported by substantial evidence. Because I would grant the Company's petition for review, I respectfully dissent.[4]

---

in the course of his refusal to clear paper drags. Nor can one reasonably claim that Respondent did not consider the entire course of Hydorn's conduct in deciding what discipline to impose.").

[4]For the reasons already set forth, I believe the Board's finding that Detroit News would not have fired Hydorn in the absence of protected concerted activity is likewise not supported by substantial evidence. Accordingly, even assuming the Board's finding of a *prima facie* case is supported by substantial evidence, I would grant the petition for review. Such a succinct holding would have avoided the mistake I believe the majority has made.