Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 17, 2003        Decided December 2, 2003

No. 02-1300

International Union of Operating Engineers,
Local 470, AFL–CIO,
Petitioner

v.

National Labor Relations Board,
Respondent

Pactiv Corporation, D/B/A Telleco Packaging, Inc.,
Intervenor

———

On Petition for Review of an Order of the
National Labor Relations Board

———

*Helen L. Morgan* argued the cause for the petitioner. *Richard F. Griffin* was on brief.

*William M. Bernstein*, Attorney, National Labor Relations Board, argued the cause for the respondent. *Arthur F.*

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Rosenfeld*, General Counsel, *John H. Ferguson*, Associate General Counsel, and *Aileen A. Armstrong*, Deputy Associate General Counsel, National Labor Relations Board, were on brief.

*Harold R. Weinrich* and *Jonathan J. Spitz* were on brief for the intervenor.

Before: HENDERSON, TATEL and ROBERTS, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LeCRAFT HENDERSON, *Circuit Judge*: The International Union of Operating Engineers, Local 470 (Union) seeks review of a decision of the National Labor Relations Board (NLRB, Board) affirming and adopting the decision of the administrative law judge (ALJ) and concluding that Pactiv Corp., a subsidiary of Tenneco Corp., d/b/a Tenneco Packaging, Inc., (Tenneco) did not commit an unfair labor practice against Gary McClain, an employee of Tenneco's plastics manufacturing facility in Beech Island, South Carolina. *See Pactiv Corp*, 337 N.L.R.B. No. 142 (July 29, 2002) (NLRB Dec.). The Union had charged that Tenneco violated section 8(a)(1) and (3) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(1), (3), by retaliating against McClain for his union organizing activity. Specifically, the Union asserted that Tenneco management acted out of anti-union animus when it contacted the Aiken County, South Carolina Sheriff about McClain's allegedly threatening behavior, resulting in McClain's arrest and involuntary psychiatric commitment, and when it later conditioned McClain's return to work upon clearance by a Tenneco-approved psychiatrist. We agree with the Board that the General Counsel failed to make out a prima facie case that the challenged acts were motivated by anti-union animus and we therefore deny the Union's petition for review. *See Wright Line,* 51 N.L.R.B. 1083 (1980), enforced, *NLRB v. Wright Line*, 662 F.2d 899 (1st Cir. 1981), *cert denied*, 459 U.S. 989 (1982).

**I.**

Following are the material facts, as found by the ALJ and adopted by the Board, leading up to and culminating in

McClain's arrest and commitment and Tenneco's refusal to reinstate him unconditionally.

Tenneco operates a non-union plastic products manufacturing facility in Beech Island, South Carolina. McClain has been employed there in various capacities since at least 1985. Sometime in the late 1980s he began working as a lubricator, a position in which he had only minimal contact with other employees.

In early 1999 Tenneco was planning a reorganization to integrate maintenance employees into the production work force. Under the reorganization, maintenance employees like McClain were slated to be reassigned to new positions for which they had to be recertified. In February 1999, worried about how McClain might react to the reorganization in light of past problems,[1] Tenneco's Human Resources Manager Ron Clark contacted Joseph Berley, Tenneco's director of occupational health services. Berley told Clark he did not see any need to take immediate action but to keep him informed.

Also in February 1999, McClain visited Human Resources Assistant Brenda Taylor to complain that people were entering his trailer and watching him while he slept, turning his clock back to make him late for work and moving his medicine. McClain also informed Taylor that he slept with a loaded gun on either side of his bed. Taylor immediately reported the conversation to Clark.

In April 1999, the day after the shooting tragedy at Columbine High School in Colorado, Clark again contacted Berley and told him that earlier that day McClain had visited his office and reported hearing two employees remark that "if anything happened to them regarding their job ... there could be violence resulting from that." JA 347. Berley and

---

[1] In 1985 McClain's supervisor Joe Powell referred him to counseling after an angry outburst and in 1986 or 1987 a consulting psychologist who interviewed McClain advised the Human Resources Department that Tenneco should not attempt to fire McClain "under any circumstances" because he was "a time bomb waiting to explode," JA 449.

Clark then participated in a teleconference with Tenneco's security director Robin Montgomery, during which they discussed McClain's previous anger problems. Berley pointed out that it might be stressful for McClain to work closely with other employees and to face the recertification requirement. In addition, Clark observed that the employees McClain had identified did not seem the type for workplace violence. It was agreed that Clark would monitor the situation.

The reorganization was announced in May and McClain began work in his new maintenance position on "A Crew" on July 10. One night shortly thereafter, Rita Wethington, McClain's neighbor, was working at the plant and found herself in need of maintenance assistance. She spotted McClain sitting in an office and asked him if he "'was maintenance on that [A] crew.'" NLRB Dec. at 5 (quoting JA 113). He responded that he wasn't and she called in another maintenance associate. A few days later she encountered Training Coordinator Linda Milton and asked Milton if McClain worked maintenance on A crew and was told that he did. During their conversation, Wethington told Milton she had observed McClain in his yard staring up into the trees and that on the day after the reorganization was implemented, he looked "agitated" and was "walking around in his yard 'throwing his hands in the air'" NLRB Dec. at 5 (quoting JA 282).

About the same time Catherine Bing, who had been assigned to train McClain in his new maintenance position, reported to Milton that McClain was not reading his work reference guide but instead wanted her to explain his new job responsibilities to him. Milton told supervisor Doug Boynton who met with McClain during the week of July 19. According to Boynton, McClain seemed unfocussed and agitated and kept changing the subject and complaining that supervisor Joe Powell had been "'picking on him.'" NLRB Dec. at 6 (quoting JA 211). McClain described to Boynton a conversation with Powell during which Powell was continuously "sliding his fingers up and down a nail" and told Boynton Powell had been putting nails in McClain's tires. *Id.* He also complained that when he had worked as a machine operator

ten years earlier "people had sabotaged his machine." *Id.* According to Boynton, McClain's behavior became increasingly "agitated" during the meeting which " 'really disturbed' " him. *Id.* (quoting JA 212).

Then an A Crew co-worker, Danny Mills, reported to Powell that McClain told him (Mills) that Powell " 'had done something to . . . [McClain] in the past' " and Mills warned Powell he " 'might want to watch his back.' " NLRB Dec. at 6 (quoting JA 141–42). Also about the same time, McClain crept up behind Powell late one shift and asked if that scared him. Powell responded " 'yes.' " *Id.* at 6 (quoting JA 237).

On July 28, 1999 Bing met with Milton and recounted four incidents involving McClain: (1) McClain complained to her that Powell had put nails in his automobile tire, (2) McClain accused Bing of instructing him incorrectly about some paperwork and warned her that she should " 'be careful' " about what she told him because " 'once he put it in his head that way that's the way it's going to be,' " NLRB Dec. at 6 (quoting 151); (3) McClain had used his own, sharp knife to perform work tasks after being told to use only a company "safety" knife and (4) McClain told her "people had done him wrong at the plant," *id.* (quoting JA 155). According to Milton, Bing also reported that McClain said he " 'had a list of people who had . . . done wrong' " and that " 'they may think he's forgotten about it, but he hadn't.' " *Id.* (quoting JA 280).

As the ALJ noted, at that point several other employees warned supervisors that they felt that McClain posed a danger to other employees: (1) former employee Angela Lowe told Milton that she was "concerned about how McClain was going to react to the reorganization, 'because he would get upset about stuff' "and that if nothing was done she feared there would be " 'another Phelon' "—referring to an Aiken County plant that had been the site of a deadly shooting spree by a recently discharged employee, NLRB Dec. at 6 (quoting JA 89, 273); (2) employee Becky Manning told Milton that "it would be dangerous to sit by Boynton or her, Milton, because, 'if Gary [McClain] came in there that

they would be the first two that he would take out,'" *id.* (quoting JA 95); (3) employee Brent Williams told Powell, as McClain walked by, "'[t]here goes your next postal worker. I have great concerns that he's capable of going off the deep end and taking some people out,'" *id.* at 7 (quoting JA 239); (4) employee Tammy Kirkland told Powell she was "afraid of McClain's actions at work" and that "she felt he was capable of doing bodily harm," *id.*; and (5) employee Chris White told supervisor Larry Wonoski "he was concerned about possible violent or aggressive behavior and related an incident in the past that had upset him when McClain had allegedly shot a dog," *id.*

Against this background, in early July the Union began an organizing drive at the plant during which McClain wore a union hat and handed out union flyers. The morning of July 28 plant manager Joseph Garrison conducted a mandatory meeting for all A Crew employees and delivered a speech opposing unionization. During the meeting McClain interrupted the speech to correct Garrison regarding a statement about union dues. Various employees present at the meeting testified that McClain "'was very agitated, very loud, very rude,'" NLRB Dec. at 7 (quoting 136); that he made audible comments such as "'[W]hen I'm done they'll know who I am,'" *id.* (quoting JA 98); "that he was rubbing both hands on his legs, the top of his thighs" and "[s]weat was running down the side of his face '[l]ike he was upset'" *Id.* After the meeting two employees—Johnny Partin and Karen Padgett—told Wonoski that McClain's behavior at the meeting had frightened them.

By that time (late July) reports that coworkers were worried about McClain reached Berley, who was already concerned about McClain because a union drive "'can be a very stressful situation'" and "can have a significant effect on an individual." NLRB Dec. at 7 (quoting JA 352). He therefore arranged for a conference call which was held the morning of July 29 among Berley and Human Resources Director Joe O'Leary at corporate headquarters and Garrison, Milton,

Clark, Boynton and Wonoski at the Beech Island plant.[2]  The parties discussed McClain's "escalating" behavior and it was decided Berley was to contact McClain's doctor and Montgomery was to contact the Aiken County Sheriff.  NLRB Dec. at 7 (quoting JA 231).

Montgomery spoke with the Sheriff and two deputies.  He related that employees had reported being frightened of McClain and specifically mentioned " 'he had used a knife that had frightened a female employee,' " NLRB Dec. at 8 (quoting JA 325), that " 'firearms had been seen in his residence,' " that " 'he'd talked about guns in the plant,' " *id.* (quoting JA 326), and that " '[a] list had been prepared . . . in the same context that if I lose my job, I've got a list prepared,' " JA 329.  One of the deputies, Jody Rowland, then had a conversation with Clark from which Rowland "understood that the sheriff's office was being asked to provide extra security." N.L.R.B. Dec. at 8.

Berley called McClain's primary care physician and was referred to his psychiatrist, David Steiner.  After speaking with Steiner, Berley reported on the conversation in a second conference call.  During the call he directed Montgomery to ask the sheriff's department to contact Steiner.  Rowland spoke with Steiner who characterized McClain as " 'a ticking time bomb.' "  NLRB Dec. at 8 (quoting JA 71–72).  While checking their records for information on McClain, the sheriff's department personnel discovered a four-year-old outstanding warrant for his arrest.  The afternoon of July 29 deputies stopped McClain en route to work, frisked him, handcuffed him and took him to the Aiken Regional Hospital.  The emergency room physician then on duty also described McClain as " 'a ticking time bomb,' " *id.* at 9 (quoting JA 71–72), and issued an emergency involuntary commitment authorization.  The deputies transported McClain to the Charter Rivers Behavioral Health Systems facility.  In describing

---

[2] The call was originally scheduled for August 3 but it was moved up to July 29 in response to a phone call from an employee expressing "significant concerns" about McClain's behavior.  JA 357–58; *see* also NLRB Dec. at 3 (Member Liebman concurring).

the arrest and commitment, Rowland testified: " 'That was our doing, not Tenneco's doing.' " *Id.* (quoting JA 83).

On August 11 the local probate court judge determined that McClain was "mentally ill" and "there was 'a likelihood of serious harm to himself or others.' " NLRB Dec. at 10 (quoting JA 464). Accordingly, he ordered outpatient treatment. On August 18 Tenneco's lawyer wrote to McClain's counsel rejecting the latter's suggestion that McClain be allowed to return to work immediately and indicating that Tenneco " 'm[ight] wish to conduct an independent evaluation of Mr. McClain's medical condition.' " NLRB Dec. at 10 (quoting JA 427). The letter further advised that McClain would not be permitted to return to work until the company was "satisfied that his condition is under control." JA 427. In a letter dated September 17 Tenneco's lawyer informed McClain's counsel that Tenneco was "moving forward with the independent medical examination" and had retained the services of a psychiatrist for that purpose. JA 429. McClain refused to submit to the proposed examination and Tenneco refused to permit him to return to work without it.

Meanwhile, McClain received out-patient treatment from the Aiken Barnwell Mental Health Facility, as ordered by the probate judge. On January 4, 2000 his treating psychiatrist wrote the probate court that McClain was "not . . . in need of further court ordered outpatient treatment" but that, "because of ongoing stresses," he "m[ight] wish to consider pursuing voluntary outpatient counseling or other treatment to help deal with these issues." JA 471.

The Union filed unfair labor practice charges against Tenneco and the General Counsel issued a complaint. The amended consolidated complaint alleges that Tenneco violated Section 8(a)(1) and (3) of the NLRA by causing the sheriff's department to arrest and detain McClain on July 29, 1999 and by refusing to reinstate him thereafter without clearance by a psychiatrist of Tenneco's choice.

The ALJ conducted a hearing in Aiken, South Carolina from March 27 through 30, 2000. On June 9, 2000 he issued a decision concluding that Tenneco did not violate the Act. In

its July 29, 2002 decision the Board affirmed the ALJ's "rulings, findings, and conclusions," adopted his recommended order and dismissed the complaint. NLRB Dec. at 1 (footnotes omitted). The Union filed a petition for review on September 25, 2002.

## II.

In analyzing an anti-union animus case such as this, the Board applies the *Wright Line* framework. Under the *Wright Line* test,

> the general counsel must first show that the "protected activity was a motivating factor in the adverse employment decision." *Frazier Indus. Co., Inc. v. NLRB*, 213 F.3d 750, 755 (D.C. Cir. 2000) (internal quotation marks omitted). If this prima facie showing is made, the burden shifts to the employer to demonstrate that "it would have made the adverse decision even had the employee not engaged in protected activity." *Vincent Ind. Plastics, Inc. v. NLRB.*, 209 F.3d 727, 735 (D.C. Cir. 2000) (citing *Wright Line, Inc.*, 251 N.L.R.B. 1083, 1089, 1980 WL 12312 (1980)).

*Ross Stores, Inc. v. NLRB*, 235 F.3d 669, 675 (D.C. Cir. 2001). The Board affirmed the ALJ's conclusion that the General Counsel failed to make out a prima facie case. The ALJ had found that, although the General Counsel had established anti-union animus on Tenneco's part,[3] the animus was not a motivating factor in McClain's arrest and commitment or in its refusal to unconditionally reinstate McClain. "We will affirm the judgment of the Board unless, 'upon reviewing the record as a whole, [this Court] conclude[s] that the Board's findings are not supported by substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case.'" *Tradesman Int'l,*

---

[3] The ALJ based his animus finding on testimony that Tenneco plant guards on one occasion accused union supporters passing out leaflets of trespassing when there was no evidence that they were. NLRB Dec. at 7.

*Inc. v. NLRB*, 275 F.3d 1137, 1141 (D.C. Cir. 2002) (quoting *Intern'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers v. NLRB,* 41 F.3d 1532, 1536 (D.C. Cir. 1994)) (alterations original). Because the ALJ's findings, as adopted and affirmed by the Board, are well-grounded in the record evidence and supported by the law, we reject the Union's challenges.

The Union challenges in particular Tenneco's conduct of the initial conference call on July 29, 1999 which led to contacting the Aiken County Sheriff. The ALJ found, however, the call was simply "a round table discussion in which management officials [of Tenneco] were seeking to obtain all of the information they could in order to determine how to handle a situation about which they were justifiably concerned." NLRB Dec. at 9. This finding is amply supported by the evidence described above and catalogued by the ALJ. As the ALJ explained:

> The record establishes that a total of at least 11 employees, 6 of whom testified in this proceeding, had made comments reflecting concerns about McClain's behavior. McClain himself had reported sleeping with two loaded guns on either side of his bed to Human Resources Assistant Taylor. Supervisors Powell and Boynton had observed behavior that they found disturbing. McClain's agitation at the captive audience meeting was observed by Boynton and Wonoski. Karen Padgett, who was sitting next to him, was frightened by his behavior and expressed concern to Wonoski. Shon Glover was sufficiently concerned that he told Plant Man[a]ger Garrison not to take McClain lightly. Wonoski had "never previously received reports that employees were scared of another employee."

*Id.* Given the number of employees who expressed concerns about McClain's conduct and the nature of the conduct they reported, Tenneco's management would have been remiss had it not taken measures to safeguard its workplace.

With regard to the arrest and detention, the ALJ found, based on the credible testimony of Rowland, that they were

carried out on the initiative of the sheriff's department alone and that Tenneco "neither requested that any action be taken against McClain nor provided the Sheriff with information upon which action could be taken." NLRB Dec. at 10.[4] It was the sheriff department's discovery of the outstanding warrant, of which Tenneco management was unaware, that led to McClain's arrest.[5]

---

[4] The ALJ properly distinguished the situation here from *Sure-Tan, Inc.*, 234 N.L.R.B. 1187 (1978), *enforced in relevant part*, 672 F.2d 492 (7th Cir. 1982), *affirmed in relevant part*, 467 U.S. 883 (1984), in which the NLRB found a violation of the Act because the employer "with full knowledge that the employees in question had no papers or work permits, requested the Immigration and Naturalization Service to investigate their status" and the ensuing investigation "resulted in immediate deportation proceedings." 234 N.L.R.B. at 1187. As the ALJ noted, Tenneco "neither requested that any action be taken against McClain nor provided the Sheriff with information upon which action could be taken." NLRB Dec. at 10. In addition, "the record reflects that [Tenneco] was unaware at the time [it requested security from the sheriff] of the outstanding warrant for McClain's arrest" and "the judge specifically credited the sheriff's deputy, Major Jody Rowland, that [Tenneco] had no involvement with his decision to execute that warrant." NLRB Dec. at 3 (Member Liebman, concurring).

[5] We find no merit in the Union's objections to the Board's motivation finding. The Union challenges the statements by Montgomery to the Sheriff as "overstated and exaggerated," Pet'r's Br. at 29, but they are solidly supported in the record. The Union also charges that the Board "ignored" the "admitted failure to investigate or verify highly inflammatory reports" before "taking action against him," *id.* at 30, but the ALJ reasonably found that no action was taken against McClain *by Tenneco*. All Tenneco did was to request security from the Sheriff. The adverse action was taken by the sheriff's office personnel after they discovered the outstanding warrant. Finally, the Union argues the ALJ failed to consider the fact that Tenneco did nothing on previous occasions, before the union organizing began, when complaints were made about McClain. As the ALJ explained, however, and the statements of co-employees support, the reason for taking action in July was that McClain's disturbing behavior was "escalating" and seems to have peaked at the July 28 meeting—whether because of the stress of

Regarding Tenneco's insistence that McClain's reinstatement be conditioned upon his being cleared by a company-approved psychiatrist, the ALJ found that Tenneco's stance resulted not from anti-union animus but from the requirements of Tenneco's employee short-term disability policy. The policy provides:

> "Associates should be returned to work through the Tenneco Packaging, Specialty Products medical designee after a disability of five or more working days absent and present proof of illness from associate's personal physician prior to release to return to work."

NLRB Dec. at 10 (quoting JA 588). As the ALJ found, Tenneco "has consistently adhered to its policy since it was instituted in November 1998" and "[n]o deviation from it occurred in 1999." NLRB Dec. at 10.[6] It is therefore not surprising that Tenneco adhered to it in McClain's case. The Union argues here, as below, that Tenneco's reliance on the provision is unreasonable because it never mentioned the policy when it refused to reinstate McClain. The ALJ reasonably rejected this contention because "[d]ocumentary and testimonial evidence establishes that, with the exception of the two explained oversights, [Tenneco] has consistently adhered to its policy since it was instituted in November 1998." NLRB Dec. at 11. The Union also argues that Tenneco discriminated against McClain in enforcing the provision more strictly than it had with any other employee, in particular by requiring extensive medical documentation. The required documentation, however, was at the selected psychiatrist's insistence, not Tenneco's. *See* JA 431 (psychiatrist's

the reorganization, the union organizing or some combination of the two.

[6] The ALJ noted that the policy was not followed twice in 1998 but that a human resources employee "credibly explained" them as "oversights"—the first involved an employee who "had gone out on November 5, prior to the plant's receipt of the policy on November 7, 1998" and the other occurred in December 1998 "when the employee returned to work during the Christmas holiday period." NLRB Dec. at 10–11.

letter to Berley requesting all of McClain's medical, psychiatric, counseling, substance abuse treatment, arrest and military records).

In sum, we believe the ALJ and the Board correctly concluded that Tenneco acted reasonably, and without discriminatory motive, in addressing McClain's "genuinely threatening behavior." NLRB Dec. at 2. Tenneco management acted with deliberation and caution in the face of mounting evidence of McClain's instability. As the ALJ and the Board found, Tenneco took no action against McClain himself but merely sought additional security, after months of monitoring McClain's conduct, to ensure plant safety. Tenneco's responsible efforts to protect all of its employees did not violate the National Labor Relations Act. Accordingly, the petition for review is

*Denied.*