# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 9, 2011          Decided June 10, 2011

No. 10-1271

JACKSON HOSPITAL CORPORATION,
DOING BUSINESS AS KENTUCKY RIVER MEDICAL CENTER,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 10-1303

———

On Petition for Review and Cross-Application
for Enforcement of an Order of the National
Labor Relations Board

———

*Kaitlin A. Kaseta* argued the cause for the petitioner. *Bryan T. Carmody* was on brief. *Don T. Carmody* entered an appearance.

*Kellie J. Isbell*, Attorney, National Labor Relations Board, argued the cause for the respondent. *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel and *Julie B. Broido*, Supervisory Attorney, were on brief.

Before: HENDERSON, BROWN and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Petitioner Jackson Hospital Corporation (Hospital) seeks review of an adverse decision of the National Labor Relations Board (NLRB or Board). An administrative law judge (ALJ) found the Hospital violated section 8(a)(3) and (1) of the National Labor Relations Act (Act) when it placed registered nurse Frances Lynn Combs on "investigatory suspension" because of her protected union activities. *Jackson Hosp. Corp.*, Cases 9-CA-42249 *et al.* (NLRB July 29, 2008) (ALJ Dec.). The Board affirmed the ALJ's finding. *Jackson Hosp. Corp.*, 355 N.L.R.B. No. 129 (2010) (NLRB Dec.). We grant the Hospital's petition and set aside the Board's decision insofar as it found the Hospital violated the Act by suspending Combs because its finding is not supported by substantial evidence in the record.[1]

**I.**

On June 8, 1998, the Board certified the United Steelworkers of America (Union) as the collective-bargaining representative of various Hospital[2] employees including registered nurses and medical lab technicians. From the start, the Union and the Hospital have had a rocky relationship,[3]

---

[1]The NLRB also alleged violations of three other Hospital employees' rights. *See infra* note 6. The Hospital's actions regarding those employees are not before us.

[2]The Hospital owns and operates the Kentucky River Medical Center, a 55-bed acute care facility and full service hospital in Jackson, Kentucky, staffed by about 300 employees.

[3]Their early history included an unsuccessful decertification attempt, a month-long strike and numerous unfair l0000abor practice

indeed, they have yet to produce a collective bargaining agreement.

In January 2003, the Hospital hired Combs as a nurse in its medical/surgical unit. Her direct supervisor was Unit Manager Kathy Thacker, who reported to Chief Nursing Officer Debbie Linkous. A few months after Combs was hired, she was tentatively selected to be coordinator of the Hospital's proposed "swing bed" unit, for which unit she performed some "preliminary work."[4] ALJ Dec. at 38 (NLRB Dec. at 27).

In early April 2006, Combs joined the Union's bargaining committee and attended two collective-bargaining sessions. When Combs learned the Hospital refused to bargain thereafter because of her participation—the Hospital considered her coordinator position part of management—she wrote a letter to Linkous declining the position as a permanent position. She then continued to participate in bargaining sessions.

On December 12, 2006, the Hospital distributed a document, which each nurse was required to sign, outlining new policies to govern administering medications to patients. Under the new policies, each nurse was to place a patient's medication in a plastic bag with the patient's label affixed, take it to the patient's room, transfer it to a medication cup, administer it to the patient and then dispose of the plastic bag in a shred container. Believing the new policy " 'would be difficult to implement,' " Combs met with Donald Rentfro, the Hospital's chief executive officer, and gave him a document setting out her concerns about the policy. ALJ Dec. at 38 (NLRB Dec. at 27)

charges against the Hospital leading to a Board finding that the Hospital violated section 8(a)(1), (3) and (5) of the Act.

[4]A "swing bed" is a "dual-use" bed used to provide both acute care and nursing care. *Dist. Mem. Hosp. of Sw. N.C., Inc. v. Thompson*, 364 F.3d 513, 514 (4th Cir. 2004).

(quoting Transcript of ALJ Hearing, *Jackson Hosp. Corp.*, Cases 9-CA-42249 *et al.* (Hearing Tr.), at 119 (Apr. 8, 2008) (Combs)). Rentfro referred the matter to Linkous later that day. The next day, Combs signed the new policy, believing it " 'was going to be revised' in order to make it 'easy to implement it.' " ALJ Dec. at 38-39 (NLRB Dec. at 27) (quoting Hearing Tr. at 120, 122) (Apr. 8, 2008) (Combs)). She acknowledged, however, that "when she signed the form there was no mention of revisions on it." *Id.* at 39 (NLRB Dec. at 27).

On January 10, 2007, Unit Manager Thacker observed Combs taking medication to a patient in an unlabeled cup rather than a labeled plastic bag, as the policy required. When Thacker pointed out she had not followed the new policy, Combs responded: " 'We don't need to be fools. We need to use common sense.' " *Id.* (NLRB Dec. at 27) (quoting Hearing Tr. at 62-63 (Nov. 27, 2007) (Combs)). Combs also told Thacker she intended to take the matter up with Linkous and five minutes later, accompanied by another nurse, Debra Adams, she went to Linkous's office. Linkous told Combs that before she could do anything, she needed to hear Thacker's version and "review the policy and procedure." Hearing Tr. at 1045 (Apr. 7, 2008) (Linkous). Linkous then promised to " 'get back with [Combs] as soon as [she] could.' " ALJ Dec. at 39 (NLRB Dec. at 27) (quoting Hearing Tr. at 1045 (Apr. 7, 2008) (Linkous)) (alterations added).

Linkous discussed Combs's infraction with Thacker about one week later and, according to Linkous's testimony, they decided to give Combs a "verbal warning." ALJ Dec. at 39 (NLRB Dec. at 27). Accordingly, on January 18, 2001, Linkous, Thacker and Human Resources Director Naomi Mitchell met in Linkous's office to deliver the warning. The ALJ found that Linkous, Thacker and Mitchell conferred before meeting with Combs and that Linkous told the others " 'if . . . Combs refused to meet with [them], that [they] would have to

place her on an indefinite suspension.' " ALJ Dec. at 39 (NLRB Dec. at 27) (quoting Hearing Tr. 1129-30 (Apr. 7, 2008) (Linkous)); *see also id.* (quoting Hearing Tr. 1604-05 (Apr. 8, 2008) (Mitchell)). Linkous then invited Combs to her office, explaining that "she 'had made a decision regarding the January 10th incident and that she wanted to talk to [Combs] about it." *Id.* at 40 (NLRB Dec. at 28) (quoting Hearing Tr. at 69. (Nov. 27, 2009) (Combs)). Combs again brought Adams along with her. When the two arrived, however, Linkous told Adams she could not stay and Adams immediately left. The ALJ found that the testimony of each of the four remaining employees was consistent in the "broad outlines" of what then followed. *Id.*

First, Combs asked Linkous whether she could have a "union representative" present, specifically offering to telephone Union Organizing Coordinator Randall Pidcock to attend. *Id.* When Linkous rejected her request, Combs responded it was her " 'understanding, having been part of the union[,] that representation for anything to do with a disciplinary discussion [she] had a right to representation for that and that [she] did not understand why [Linkous] was telling [her] no.' " ALJ Dec. at 40-41 (NLRB Dec. at 28) (quoting Hearing Tr. at 73 (Nov. 27, 2007)) (Combs)) (first alteration in original). Linkous then asked Combs if she was " 'refusing to go ahead with the meeting' " and Combs " 'said yes.' " *Id.* at 41 (NLRB Dec. at 28) (quoting Hearing Tr. at 1589 (Apr. 8, 2008) (Mitchell)). Linkous then told Combs she was being placed on "investigatory suspension."[5] ALJ Dec. at 41 (NLRB Dec. at 28); *see also* Hearing Tr. at 74 (Nov. 27, 2007) (Combs) (Linkous "then said 'I'm sorry, Lynn, but I will have to suspend

---

[5]According to Combs, before she was suspended, Linkous asked her: " 'You are not letting me give you this?' " while pointing "to some papers on the front of her desk." Hearing Tr. at 73. In response, Combs again asserted she thought she had a right to have a representative present. *Id.* at 74.

you indefinitely pending an investigation.' ").  Combs asked if she would be paid "if it turned out that she had been correct in her belief regarding her right to representation." ALJ Dec. at 41 (NLRB Dec. at 28).  Mitchell said "the normal practice" was to pay an employee if it was ultimately determined an employee had done nothing wrong.  Hearing Tr. at 1589 (Apr. 8, 2008) (Mitchell).  Combs testified that before she left the meeting, she told the three other participants:  " 'I have no personal issues with you.  You all have treated me fairly.  I just believe this is a matter of employee rights.' "  ALJ Dec. at 41 (NLRB Dec. at 28) (quoting Hearing Tr. at 74 (Nov. 27, 2007) (Combs)).  Finally, Combs asked if Linkous wanted her to see that her patients were covered by another nurse and then clock out and Linkous said "[y]es."  ALJ Dec. at 41 (NLRB Dec. at 28); Hearing Tr. at 74 (Nov. 27, 2007) (Combs).

The following day, Combs informed Pidcock of her suspension and Pidcock wrote a letter to Rentfro, stating in relevant part:

> On Thursday, January 18, 2007 Kentucky River Medical Center indefinitely suspended employee Frances Lynn Combs when she was called in to a disciplinary meeting and insisted on Union representation. I hereby request you meet with Ms. Combs and myself at your earliest convenience to discuss same, preferably late today or early next week.

Letter from Randy Pidcock to Dominic Rentfro (Jan. 19, 2007) (Joint Appendix (JA) at 165) (Pidcock Letter).  Rentfro responded by letter three days later, agreeing to accommodate Pidcock's request and promising to "defer making a final decision . . . until after [Pidcock]  ha[d] been afforded an opportunity to meet as . . . requested, unless [Pidcock] advise[d] [him] to the contrary.""  Letter from Dominic Rentfro to Randy Pidcock (Jan. 22, 2007) (JA 166) (Rentfro Letter).  He further requested the meeting be deferred until the end of the

investigation when he had "a full opportunity to gather the facts underlying . . . Combs' suspension, and consult with Counsel." *Id.* Enclosed with Rentfro's response was a second letter, of the same date, from Linkous to Combs to confirm the latter's placement on"unpaid investigatory suspension" after she "expressly refused to meet with [Linkous] without being accompanied by Debra Adams or . . . Randall Pidcock." Letter from Debbie Linkous to Frances Lynn Combs (Jan. 22, 2007) (JA 167).

The Hospital and the Union subsequently agreed to discuss Combs's suspension immediately preceding a bargaining session that had been scheduled February 9, 2007 but the session was cancelled because of a medical emergency in the family of the only remaining Union bargaining team member. ALJ Dec. at 41 (NLRB Dec. at 28); Hearing Tr. at 1495-96 (Apr. 8, 2008) (Rentfro; *id.* at 1518-22 (Pidcock). The two sides again planned to meet immediately before the next scheduled bargaining session on February 16, 2007 but this too was cancelled because of the same Union member's family medical emergency. Hearing Tr. at 1496 (Apr. 8, 2008) (Rentfro); *id.* at 1522-24 (Pidcock). The two sides never scheduled another meeting on the suspension nor did they in fact meet thereafter either to bargain or to discuss the suspension. *Id.* at 1496 (Rentfro); *id.* at 1524-25 (Pidcock).

Meanwhile, the NLRB General Counsel had filed a complaint against the Hospital on August 11, 2005, alleging a single unfair labor practice involving another employee. Other allegations were added culminating in the instant charge based on Combs's investigatory suspension, which was added on January 19, 2007. The parties entered into an informal settlement agreement on August 22, 2007, which the Regional Director vacated in October 2007, when he issued an amended consolidated complaint. Order & Am. Consolidated Compl., *Jackson Hosp. Corp.*, Cases 9-CA-42249 *et al.*, ¶¶ 6-8 (Oct. 4,

2007). The complaint alleged inter alia that the Hospital violated section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3), by suspending Combs based on her protected Union activity.[6] *Id.* ¶¶ 5, 9. It also sought from the Hospital all records "necessary to analyze the amount of backpay due." *Id.* at 5.

The ALJ conducted a seven-day hearing beginning November 27, 2007 and ending April 9, 2008. On July 29, 2008, he issued a decision finding the Hospital violated section 8(a)(3) and (1) when it suspended Combs "in an unlawfully discriminatory manner," "primarily motivated by animus against her due to her protected activities." ALJ Dec. at 2, 50 (NLRB Dec. at 7, 33). In a decision dated August 27, 2010, a three-member panel of the Board affirmed the ALJ's determination that the suspension violated section 8(a)(3) and (1). NLRB Dec. at 1.

The Hospital timely petitioned for review and the Board timely filed a cross-application for enforcement.

## II.

"We must uphold an order of the Board unless it rests upon a finding not supported by 'substantial evidence' or the Board failed to apply the proper legal standard or departed from precedent without giving a reasoned justification therefor." *S & F Mkt. St. Healthcare LLC v. NLRB*, 570 F.3d 354, 358 (D.C. Cir. 2009) (quoting 29 U.S.C. § 160(f)). As discussed *infra*, we

---

[6]The amended consolidated complaint also alleged the Hospital discharged three other employees because of protected activity. The ALJ dismissed the charges as to two of them but found the Hospital violated the Act by discharging the third, a finding the Board reversed.

conclude the Board's decision is not supported by substantial evidence.[7]

The Board upheld the ALJ's analysis under its decision in *Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced*, *NLRB v. Wright Line*, 662 F.2d 899 (1st Cir. 1981), *cert. denied*, 455 U.S. 989 (1982). Under the *Wright Line* test,

> the general counsel must first show that the protected activity was a motivating factor in the adverse employment decision. If this prima facie showing is made, the burden shifts to the employer to demonstrate that it would have made the adverse decision even had the employee not engaged in protected activity.

*Int'l Union of Operating Eng'rs, Local 470 v. NLRB*, 350 F.3d 105, 110 (D.C. Cir. 2003) (internal quotation marks omitted). The Board affirmed the ALJ's determination that the General Counsel made a prima facie showing that Combs's union activity was a motivating factor of her suspension based on three findings. First, the NLRB concluded, correctly, that Combs's union activity and the Hospital's knowledge thereof were undisputed. Linkous "admitted that she was aware of Combs' active participation in contract negotiations and that Combs was

---

[7]As a preliminary matter, the Hospital argues that the Board lacked authority to issue its July 29, 2008 order directing the NLRB Office of the Executive Secretary to transfer the case from the ALJ to the Board because the Board at that time lacked a quorum and therefore lacked statutory authority to transact business. *See New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635 (2010) (quorum of at least three members required for Board to act). Even if the Board had lacked authority to transfer the case at that time, it plainly had authority under section 10 of the Act, 29 U.S.C. § 160, to decide the case when it issued its final decision on August 27, 2010, by which time its membership had reached a quorum. *See* NLRB Dec. at 1 (identifying three members on decision panel).

'strong in the Union' at the time Linkous suspended her." NLRB Dec. at 4. Second, the Board "infer[red] animus from the circumstances surrounding Combs' indefinite suspension," namely, "the conduct of management before, during, and after the meeting with Combs at which she was indefinitely suspended." *Id*. At this point, the Board went off track.

According to the Board, the Hospital displayed animus before and during the meeting because the three management representatives "set up Combs by provoking her into insisting on a *Weingarten* right that she did not in fact have." *Id*. In *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 262 (1975), the Supreme Court approved the Board's "recognition that § 7 guarantees an employee's right to the presence of a union representative at an investigatory interview in which the risk of discipline reasonably inheres." Long ago, however, the Board clarified the *Weingarten* right, excluding from its reach a meeting such as the one here:

> As long as the employer has reached a final, binding decision to impose certain discipline on the employee prior to the interview, based on facts and evidence obtained prior to the interview, no Section 7 right to union representation exists under *Weingarten* when the employer meets with the employee simply to inform him of, or impose, that previously determined discipline.

*Baton Rouge Water Works Co.*, 246 N.L.R.B. 995, 997 (1979); *accord Haw. Tribune-Herald*, 356 N.L.R.B. No. 63, at 14 (2011). Combs had no *Weingarten* right to representation because Linkous and Thatcher had already decided on the form of discipline to impose—a verbal warning—and the sole purpose of the meeting was to deliver the warning to her.

According to the ALJ's provocation theory—accepted by two of the Board panel's three members—the three managers

deliberately schemed to, and did, manipulate Combs into invoking her non-existent *Weingarten* right in order to justify suspending her.[8] Apparently, the scheme involved anticipating that Combs would bring a companion to the meeting and that she—a long time Union member and supporter as well as a member of the Union's bargaining team but unaware of the long-established contour of the *Weingarten* representation right—would insist on her non-existent right to representation to the point of refusing to participate in the meeting without it. The Board's theory is mere speculation without a jot of evidentiary support in the record. Granted, the managers could have foreseen Combs would likely attend the meeting accompanied by another employee—as she did on January 10, 2007 and apparently on other occasions as well. *See* Hearing Tr. at 1130 (Apr. 7, 2008) (Linkous) ("[N]ormally when she came to my office, she did have someone with her."). In addition, it is undisputed that Linkous suspended her because she refused to continue with the meeting unless she was afforded the non-existent *Weingarten* right to have Union representation at the meeting. There is no evidentiary link, however, to causally connect the two facts. The record contains no evidence, for example, that during the pre-meeting conference, the managers discussed the *Weingarten* representational right or its limitation or even (contrary to the Board's assertion on appeal) "the possibility that Combs might refuse to participate *without union representation*." NLRB Br. at 19 (citing Hearing Tr. at 1129-30 (Apr. 7, 2008) (Linkous)) (emphasis added); *id.* at 1604-05 (Apr. 8, 2008) (Mitchell). The pre-meeting conference appears from the record to have been nothing other than an opportunity

---

[8]Member Schaumber "f[ound] it unnecessary to rely upon the theory that 'management set up Combs by provoking her into insisting on a *Weingarten* right she did not in fact have' " and "d[id] not agree that . . . managers met to discuss what steps to take if Combs invoked a *Weingarten* right." NLRB Dec. at 4 n.10.

for all three managers to prepare for the meeting with Combs, ensuring they all knew what discipline was to be imposed and what would happen if Combs refused to meet with them—a precaution that proved prudent as events unwound. There is no record evidence that the three were planning to bushwhack Combs, as the ALJ surmised and the Board agreed. The record reflects even Combs herself did not see it that way. *See* Hearing Tr. at 74 (Nov. 27, 2007) (Combs) ("I have no personal issues with you. You all have treated me fairly.").[9]

Nor does the Board fare any better in its reliance on the Hospital's post-suspension conduct. The Board concluded that the ALJ

> reasonably found that the "contrast between the intended length of investigatory suspensions under the Hospital's policies and the interminable length of Combs' suspension," coupled with the "disparity between Combs' protracted suspension and the treatment of other employees" placed on investigatory suspension, supports a finding of animus directed against Combs for her participation in protected union activities.

---

[9]The Board found it significant that "after Linkous told Combs that she had no right to a representative," Mitchell "maintained what the judge described as a 'strange and disturbing silence' " notwithstanding "as the authoritative representative of the human resources department, [she] could have explained Combs' rights to her, and possibly averted Combs' walkout." NLRB Dec. at 4 (quoting ALJ Dec. at 46 (NLRB Dec. at 31)). Mitchell was under no obligation, however, to explain to Combs why she had no *Weingarten* right—especially given her limited role at the meeting convened by chief nursing officer Linkous in order to discipline a member of her nursing staff. As Mitchell observed, she "wasn't the one doing the meeting." Hearing Tr. at 1597 (Apr. 6, 2008) (Mitchell).

NLRB Dec. at 4 (quoting ALJ Dec. at 48 (NLRB Dec. at 32)). In support, the Board asserted that "[t]he record shows that prior investigative suspensions at the facility typically took anywhere from 3 days to 2 weeks," noting that "the investigatory suspension of James Fields, another alleged discriminatee in this case, led to a careful investigation to determine the facts and consultation with medical experts, yet lasted only 3 weeks." *Id*. nn.11 & 12. The undisputed evidence, however, manifests the reason for the cited "disparity"—and it had nothing to do with the pace of the Hospital's investigation of Combs's conduct. In his letter to Rentfro, Pidcock expressly requested that he and Combs together meet with Rentfro regarding Combs's suspension. Pidcock Letter. In his letter, Rentfro agreed to accommodate Pidcock's request and to defer a final decision on Combs until Pidcock was "afforded an opportunity to meet as . . . requested," unless Pidcock "advise[d] [him] to the contrary." Rentfro Letter. Subsequently, the parties scheduled two successive meetings for this purpose—first on February 9, 2007 and then on February 16, 2007—each of which the Union cancelled. The Union makes no claim it subsequently attempted to reschedule the meeting Pidcock had requested of Rentfro nor does it explain why its failure to do so should be overlooked. Under these circumstances, it makes no sense to place blame on the Hospital, as the Board has done, for the lack of communication between them. After it cancelled the meetings, the Union itself sat idle as Combs's potential backpay piled up.

Having offered insubstantial evidence, if any, to establish that Combs's protected union activity was a motivating factor in her suspension, the General Counsel failed to carry his burden under the first prong of the *Wright Line* test so as to make out a prima facie case and shift the burden of proof to the Hospital. The Board, therefore, had no basis to conclude, as it did, that the Hospital violated section 8(a)(3) and (1) of the Act.

For the foregoing reasons, we grant the Hospital's petition for review and deny the Board's cross-application for enforcement.

*So ordered.*